No. 92-339

IN THE SUPREME COURT OF THE STATE OF MONTANA

1993

CHARLES DEES,

        Plaintiff, Respondent and
           Cross-Appellant,

    vs.

AMERICAN NATIONAL FIRE INSURANCE
COMPANY, a New York corporation,

        Defendant, Appellant and
           Cross-Respondent.

**FILED**

SEP 14 1993

*Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

---

APPEAL FROM:  District Court of the Twelfth Judicial District,
             In and for the County of Hill,
             The Honorable Leonard H. Langen, Judge presiding.

COUNSEL OF RECORD:

        For Appellant:

           Robert F. James; James, Gray & McCafferty
           Great Falls, Montana

        For Respondent:

           Mort Goldstein; Goldstein Law Firm, Havre, Montana

---

                Submitted on Briefs:  July 15, 1993

                         Decided:  September 14, 1993

Filed:

_____
           /Clerk

Justice John Conway Harrison delivered the Opinion of the Court.

American National Fire Insurance Company (American National) appeals from a judgment entered on a jury verdict in the Twelfth Judicial District Court, Hill County, awarding respondent Charles Dees (Dees) compensatory and punitive damages. We affirm in part and reverse in part.

American National raises the following issues on appeal:

1. Whether the District Court erred in denying American National's motions for summary judgment and directed verdict on the issue of its alleged violations of the Unfair Trade Practices Act.

2. Whether the District Court erred in denying American National's motion for mistrial based on Dees' testimony about his costs and attorney's fees.

3. Whether the District Court erred in not striking the jury award of punitive damages.

4. Whether the District Court erred in awarding pre-judgment interest on the punitive damages award.

Dees' cross-appeal raises the following issue:

5. Whether the District Court erred in reducing the jury award of punitive damages.

This case originated as an action on a promissory note, filed by the Solem Insurance Agency (Solem) of Havre, Montana, in March 1990. Dees was the defendant. The note represented the $5,772 premium for "companion plan" hail insurance, issued to Dees by American National and covering 1,310.8 acres planted in wheat and barley. The insurer's liability was limited to $50 per acre, but an endorsement on the policy included a multiplier that would triple Dees' recovery in the event of loss. Dees purchased the

2

policy on June 26, 1989, to cover the 1989 crop year.

On July 10, 1989, a hail storm passed over Dees' wheat fields near Kremlin, Montana. Dees was working with his father at the farm shop, about four miles from the fields for which he eventually filed a claim for hail damage. After the storm he and his father inspected his fields and noticed that numerous plants had been knocked over in two adjoining fields, each about 160 acres in size. He testified that it "looked like a third of my crop was knocked over." For purposes of litigation, the two fields are designated by their location in Township 31 North, Range 13 East, Section 3, and Township 32 North, Range 13 East, Section 34 (Sections 3 and 34).

Evidence of hail damage in these fields was provided at trial through the testimony of Arnold Berg, a neighbor, who said that he had observed hail in Dees' fields immediately after the storm, and Marty Ritterhouse, the custom cutter who harvested Dees' wheat during the first week of August 1989.

Ritterhouse testified that he had been harvesting wheat in the Hi-Line area since the early sixties; that he had often observed the effects of hail on spring wheat in the area; and that in August 1989 the effects of hail were "plumb obvious" in Dees' fields in Sections 3 and 34. In particular, he mentioned broken plants, heads of wheat lying on the ground, and the typical hail storm pattern of downed plants in a relatively narrow strip, curving from southeast to northwest. He agreed that one-third of the crop was a reasonable estimate of Dees' loss in the two fields.

Photographs taken by Dees on August 7, 1989, which were entered in evidence at the trial, showed rows of standing wheat with numerous stems lying on the ground between the rows.

Dees' wheat was a special type called "Newana." According to Donald Baldridge, a Montana State University agronomist who testified for Dees, Newana wheat was developed as a short-stemmed, semi-dwarf variety of spring wheat. It has very strong stems that resist "lodging" or falling over, and shatter-resistant heads. Looking at the fallen wheat in Dees' photographs, Baldridge testified that he had never observed that kind of breakage in Newana spring wheat from wind alone, and that it "looks like hail damage to me."

On the evening of July 10, the day of the storm, Dees telephoned his insurance agent and reported that his spring wheat had been damaged by hail. He expected representatives of the insurance company to inspect his wheat soon afterward, but no one came until August 1, 1989. By that time the field in Section 3 had been cut, with patches left uncut for inspection, but the field in Section 34 had not been cut because the custom cutter considered it too green.

Victor Velk, the agent who had sold Dees the companion hail policy, arrived at Dees' farm late on August 1 with James Schaible, an American National adjuster. Schaible had not intended to "adjust" Dees' claim that day, because he had already worked a full day on another claim and was tired. To accommodate Dees, however, he made some informal observations in Section 3. According to his

4

testimony at the trial, he told Dees that he had probably lost twenty to twenty-five percent of his crop, but not because of hail. He observed that the wheat stems were bent over, not broken, and were all bent over at one point; therefore, Schaible testified, the damage appeared to be due to wind, not hail.

Dees testified that he had seen Schaible counting wheat stems in an uncut portion of Section 3 and that Schaible had told him that his loss was approximately twenty-three percent. While they were still in the field, Dees testified, he asked Velk, the agent, what he would recover under his companion hail policy. Velk told him that under his particular policy the "pay out" would be roughly sixty to eighty percent. According to Dees, "that's when Mr. Schaible changed [his] mind about finishing an adjustment."

Two days later, Velk returned with a second adjuster, Sam McCormick. McCormick had been adjusting hail insurance since 1975; he estimated at the trial that he had made over one thousand hail adjustments during his career. On August 3, McCormick inspected uncut patches of wheat in Section 3 as well as the uncut wheat in Section 34. He testified that he observed some crop damage, but "I just could not find the type of thing that indicated that we had had a hail loss." He said that he had explained to Dees that if it were hail damage, the stems of the wheat would be broken in a variety of places, not uniformly bent over near the ground; he also said that at the time, Dees did not disagree with this explanation. Dees testified, however, that McCormick told him the wheat had been damaged by wind, and that he "couldn't believe it. . . . I was in

5

shock . . . ."

After McCormick inspected the fields, he asked Dees to sign a "withdrawal of claim" form acknowledging that he had not sustained a loss that would entitle him to payment under his American National hail insurance policy. Dees refused to sign this form.

On November 28, 1989, Dees' attorney, Mort Goldstein, wrote to American National, stating that Dees had lost 25 percent of his crop, due to hail, and that the loss payable by American National under its companion hail policy exceeded the amount of the unpaid premium. Goldstein's letter demanded payment of the cash balance or, in the alternative, joint appraisal of Dees' loss using the procedures outlined in the policy, and included the name and telephone number of the custom cutter who had observed the damage to Dees' crop in August. American National did not respond to this letter. In March 1990, the insurance agency initiated its collection action against Dees.

Dees asserted in his answer that the promissory note was "contingent," not intended to be enforced until after American National had paid his claim for hail damage, which Dees then estimated at $9,462. He relied on Solem's representation, he said, that Solem and American National:

> would at all times pay for hail damage, and that Charles Dees would not be required to pay the face value on the alleged "promissory note", if there was an amount due to Charles Dees for hail damage . . . that equaled . . . or was greater than the face value of the contingent note.

Dees' answer included a counterclaim against American National for the damage to his crop, plus interest, costs, attorney's fees, and

exemplary damages.

After hearing oral argument on March 5, 1991, the court granted Solem's motion for summary judgment, on the grounds that Dees was precluded from admitting oral evidence "to prove that the Promissory Note had terms and conditions other than those set forth in the written document." Dees subsequently paid the full amount due on the promissory note. At a second hearing on March 7, 1991, the court denied American National's motion for partial summary judgment on Dees' counterclaim.

A jury trial on Dees' counterclaim began on April 1, 1991, and ended on April 5, 1991, with a verdict for Dees. The special verdict form is reproduced below, with the jury's response to each question.

> QUESTION NO. 1:   Did any of the Plaintiff's acres, insured under the companion hail insurance policy in evidence in this case, suffer a reduction in crop yield directly caused by hail in excess of five percent (5%)?
>
> ANSWER:  Yes
>
> QUESTION NO. 2:  If so, how many of the acres . . . ?
>
> ANSWER:  315.4
>
> QUESTION NO. 3:  What is the percent overall reduction in crop yield directly caused by hail to the acres identified in your answer to Question No. 2?
>
> ANSWER:  31.8%
>
> QUESTION NO. 4:   Did defendant, under the instructions given to you, violate the Montana Unfair Claims Settlement Practices Act?
>
> ANSWER:  Yes
>
> QUESTION NO. 5:   Did defendant have a reasonable basis either under the law as given to you in the instructions or in fact for denying payment on the hail claim?

7

ANSWER:  No

QUESTION NO. 6:  Do you find by clear and convincing evidence that defendant was guilty of actual malice, as defined by the Court's instructions?

ANSWER:  Yes

QUESTION NO. 7:  Do you find by clear and convincing evidence that punitive damages should be assessed against the defendant?

ANSWER:  Yes

Based on these responses, the court calculated Dees' actual damages as $12,679.  The jury retired a second time to determine the amount of punitive damages, having first been given, as a new exhibit, a copy of American National's 1990 Annual Statement.  This statement had been filed with the Montana Insurance Commissioner, pursuant to law.  It showed that in 1990 American National had assets of $79 million and a surplus of $14 million.

The jury deliberated for approximately one hour before delivering the following verdict:

QUESTION NO. 1:  What amount of punitive damages do you assess against the defendant American National Fire Insurance Company?

ANSWER:  $575,000

On April 24, 1991, American National moved for judgment notwithstanding the verdict, pointing out that three insurance adjusters and American National's expert witness, an agronomist consultant from Fairfield, Montana, all testified that Dees had not sustained a compensable hail loss.  Therefore, American National argued, it had a reasonable basis for denying Dees' claim and could not be held liable for unfair claims practices.

The District Court denied this motion in an order entered on April 22, 1992. On the same day it filed its findings of fact and conclusions of law relating to punitive damages, as required by § 27-1-221(7), MCA, approving the jury verdict but concluding that the punitive damages award was excessive. The accompanying order required American National to pay Dees the sum of $12,679 in actual damages, plus $300,000 in punitive damages, "together with interest on said sums at the rate of 10 percent per annum from April 5, 1991 to April 21, 1992, . . ." or $32,643.90. The total judgment, including $499.20 in costs, was $345,822.10, to bear interest from April 21, 1992, at the rate of ten percent per annum.

American National filed a supersedeas bond and moved for a stay of execution pending appeal; the court approved the bond and stayed execution. Dees cross-appealed the court's reduction of the jury's punitive damages award.

I

Did the District Court err in denying American National's motions for summary judgment and directed verdict on the issue of its alleged Unfair Trade Practices Act violations?

Summary Judgment

In his counterclaim, Dees asserted that American National had violated the Montana Unfair Trade Practices Act, § 33-18-101 et seq., MCA, by misrepresenting his coverage under the companion hail policy; by failing to conduct a reasonable investigation of his claim; and by making no attempt to settle the claim after its liability had become reasonably clear. The relevant subsections of

9

the Act follow.

> No person may, with such frequency as to indicate a general business practice, do any of the following:
>
> (1)  misrepresent pertinent facts or insurance policy provisions relating to coverages at issue;
>
> . . .
>
> (4)  refuse to pay claims without conducting a reasonable investigation based upon all available information;
>
> . . .
>
> (6)  neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;
>
> . . .

Section 33-18-201, MCA.

Dees also requested exemplary or punitive damages pursuant to § 33-18-242, MCA, which provides an independent cause of action for damages caused by a violation of certain subsections of § 33-18-201, MCA, including those cited in Dees' counterclaim. Section 33-18-242, MCA, also provides for exemplary damages assessed in accordance with § 27-1-221, MCA. In an action under § 33-18-242, MCA, a plaintiff is not required to prove that the violations were of such frequency as to indicate a general business practice. Section 33-18-242(2), MCA. An insurer, however, may not be held liable under § 33-18-242, MCA, if it had "a reasonable basis in law or in fact" for contesting the plaintiff's claim. Section 33-18-242(5), MCA.

In February 1991, American National moved for partial summary judgment on the issue of unfair trade practices only. Summary judgment on that issue was appropriate, American National argued,

10

because Dees' deposition indicated "at worst" a difference of opinion between the hail adjusters and himself concerning the amount of hail damage to his crop, and because Dees had presented no evidence of fraudulent, unfair, or bad faith acts or omissions on the part of American National. The District Court, however, found that Dees had raised factual issues. In particular, it found a jury question as to whether American National's three-week delay in adjusting Dees' claim was to Dees' advantage, as American National claimed, or whether it indicated negligent handling of Dees' claim.

American National argues on appeal that the District Court should have granted partial summary judgment because it had a reasonable basis for denying Dees' claim. It relies on Britton v. Farmers Ins. Group (1986), 221 Mont. 67, 71-72, 721 P.2d 303, 306, for the proposition that "an insurance contract must include a broad freedom in the insurer to evaluate claims under the policy and to reject nonmeritorious claims." Our primary holding in Britton, however, was that an insurer does not act reasonably if it declines to pay an insured's claim merely upon inadmissible evidence or testimony. Here, conflicting evidence was presented as to whether American National reasonably denied Dees' claim.

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), M.R.Civ.P. The initial burden of demonstrating the absence of a genuine issue of material fact lies with the moving party; once the moving party has met that burden,

11

the party opposing summary judgment must establish that genuine issues of material fact exist. Peschel v. Jones (1988), 232 Mont. 516, 521, 760 P.2d 51, 54. Conclusory or speculative statements are insufficient to raise a genuine issue of material fact. Simmons v. Jenkins (1988), 230 Mont. 429, 432, 750 P.2d 1067, 1069.

Here, Dees submitted an affidavit stating that he had agreed to pay an unusually high premium for American National's companion hail policy because he had been led to believe by its agent, Velk, that he would not be subjected to delay and inequitable denial of his claim, and stating further that he had notified American National that the custom cutter, Marty Ritterhouse, was available as a witness who had observed the effects of the hail storm before the wheat was cut. Ritterhouse submitted a supporting affidavit, stating that he had observed hail damage greater than 23 percent in Dees' fields and that no American National representative had ever contacted him concerning his observations. American National admittedly limited its investigation to a routine visit by its adjuster.

We hold that Dees met his burden of establishing a genuine issue of material fact as to whether American National had denied his claim without reasonable investigation, and that American National was not entitled to summary judgment on the issue of unfair trade practices. See Walker v. St. Paul Fire & Marine Ins. Co. (1990), 241 Mont. 256, 786 P.2d 1157, in which we reversed summary judgment for the insurance company because the plaintiff had set forth sufficient facts to establish an issue as to whether

12

a reasonable investigation had been made, as required by § 33-18-201(4), MCA.

## Directed Verdict

On the fourth day of the trial, after the adjuster McCormick testified that he had found no evidence of hail damage in Dees' wheat fields, American National moved for a directed verdict on all claims. The court heard oral argument in chambers and denied the motion without comment.

"A motion for directed verdict is properly granted only in the complete absence of any evidence to warrant submission to the jury, and all inferences of fact must be considered in the light most favorable to the opposing party." Britton, 721 P.2d at 317. If the evidence, viewed in a light most favorable to the opposing party, indicates that reasonable people could differ as to conclusions drawn from the evidence, a directed verdict is not proper. Weber v. Blue Cross of Montana (1982), 196 Mont. 454, 462-463, 643 P.2d 198, 202.

Here, Dees presented evidence in the form of documents, expert and lay testimony, and photographs to support his contention that American National had denied his claim without conducting a reasonable investigation. This evidence was sufficient to warrant submitting the issue of unfair trade practices to the jury. The District Court properly denied American National's motion for directed verdict.

## II

Did the District Court err in denying American National's

13

motion for mistrial based on Dees' testimony about his costs and attorney's fees?

During direct examination at the trial, Dees stated, in response to a question asking him to state the amount of damages he was requesting, that "I have got way more money stuck in this thing than I will ever recover . . . ." Goldstein responded, "By stuck in this thing, what do you mean stuck in this thing?" Counsel for American National objected on grounds of relevance, and the judge said to Goldstein, "Ask a question. I am used to sustaining or refusing objections." Goldstein asked:

> Have you incurred fees for bringing witnesses to this case and attorney fees in order to try and collect [the] hail proceeds?

Dees answered, "Yes. I have. Quite substantial." Goldstein continued, "Approximately how much?" Counsel for American National objected again. The court sustained the objection and recessed for a discussion in chambers. American National then moved for a mistrial, on the grounds that the jury had been influenced before counsel had a chance to object. After extended discussion with counsel, the court denied this motion.

American National argues that evidence of the costs Dees incurred in pursuing his claim was irrelevant to the issues of whether Dees should recover for hail damage and whether American National had acted in bad faith. American National infers from the unusually large punitive damage award that this evidence was prejudicial.

Our standard of review in determining whether a mistrial was

14

appropriately denied is whether the district court abused its discretion. Kuhnke v. Fisher (1987), 227 Mont. 62, 68, 740 P.2d 625, 628. As we observed in Kuhnke, the district court judge hears the entire trial and is in the best position to determine the prejudicial effect of attorney misconduct on the jury.

Here, Judge Langen denied American National's motion for a mistrial on the grounds that he already had sustained its objection to Goldstein's questions. Later, in his findings of fact and conclusions of law, he attributed the jury's punitive damages award to American National's "dogmatic stand that there was no hail damage" and to the "arrogance and haughtiness" of its witnesses during the trial. As the jury was exposed to American National's witnesses and their testimony repeatedly throughout the five-day trial, it is reasonable to infer, as Judge Langen presumably did, that Dees' single brief reference to costs was comparatively insignificant. We conclude that the court did not abuse its discretion in denying American National's motion for a mistrial.


III

Did the District Court err in not striking the jury award of punitive damages?

In an action brought under the Montana Unfair Trade Practices Act, punitive damages may be assessed, pursuant to § 27-1-221, MCA, for a violation of subsections (1), (4), (5), (6), (9), or (13) of § 33-18-201, MCA. Section 33-18-242(4), MCA. Here, the jury found that American National had violated subsections (1), (4), and

15

(6).

This Court will not overturn a jury verdict as long as the verdict is supported by substantial, credible evidence, viewed in a light most favorable to the prevailing party. Thayer v. Hicks (1990), 243 Mont. 138, 156, 793 P.2d 784, 795. We cannot reweigh the evidence or disturb the findings of the jury unless the evidence is so inherently improbable as not to be entitled to belief. Sizemore v. Montana Power Co. (1990), 246 Mont. 37, 48, 803 P.2d 629, 636.

Here, Dees presented expert and eyewitness testimony, photographs, and documents supporting his contention that he had sustained a substantial loss as a result of the hail storm of July 10, 1989, and that he was entitled to compensation for that loss. Even though experienced adjusters and another expert witness offered credible evidence and expert testimony indicating that Dees' loss was not a result of the hail storm and therefore was not compensable, Dees' evidence was sufficient to support the jury verdict in his favor.

The remaining question is whether Dees met the statutory standard for a punitive damages award. Under § 27-1-221, MCA, reasonable punitive damages may be awarded when a defendant has been found guilty of actual malice. Section 27-1-221(2), MCA, provides:

> A defendant is guilty of actual malice if he has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
>
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury

16

to the plaintiff; or

(b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

"All elements of the claim for punitive damages must be proved by clear and convincing evidence, . . . [which] is more than a preponderance of evidence but less than beyond a reasonable doubt." Section 27-1-221(5), MCA.

A jury award of punitive damages must be reviewed by the district court judge. Section 27-1-221(7)(c), MCA. Accordingly, Judge Langen reviewed the award and concluded that the jury correctly assessed punitive damages against American National, based on clear and convincing evidence that American National had been guilty of actual malice toward Dees and had violated the Montana Unfair Trade Practices Act.

Among the twenty-three findings of fact listed by the judge, the following best support his conclusion that American National intentionally disregarded facts that created a high probability of injury to Dees and deliberately acted with indifference to the high probability of injury to Dees:

1. Had the adjuster taken the time to examine adjoining fields, where no damage had occurred, he would have determined that the damage in Dees' fields could not have been caused by wind, because wind typically has a more generalized effect than hail does.

2. Had the adjuster taken the time to consult knowledgeable sources, he would have learned that Newana wheat had been developed as a short-stemmed, anti-lodging strain and that hail damage to Newana wheat differs from hail damage to ordinary long-stemmed wheat.

The court's statement that hail damage to Newana wheat differs from hail damage to other wheat should be characterized as

17

inference rather than fact, but it is consistent with the testimony of Donald Baldridge, the Montana State University agronomist who testified for Dees.

Goldstein asked Baldridge whether hail would necessarily cause breakage at random points on the stems of Newana wheat, as the adjusters had testified, and then changed his question without waiting for an answer. He asked whether anything in Dees' August 1989 photographs indicated to Baldridge that the Newana spring wheat in the photographs was not knocked over by hail. The photographs show that the fallen wheat was bent over or broken off uniformly, near the ground, and not at random points on the stems. Baldridge replied, "Well, this looks like hail damage to me."

It was evident from the adjusters' testimony that they had not considered the specific characteristics of Newana wheat, nor had they looked for wind damage in the adjoining fields. In these omissions, and considering Baldridge's testimony about the characteristics of Newana wheat and other testimony comparing wind damage with hail damage, the jury could have found clear and convincing evidence that American National was guilty of actual malice as defined in § 27-1-221(2), MCA.

In his conclusions of law, Judge Langen addressed each of the nine factors that § 27-1-221(7), MCA, requires him to consider in reviewing a jury award of punitive damages. American National takes exception to the judge's conclusion regarding the first factor, which is "the nature and reprehensibility of the defendant's wrongdoing." Judge Langen stated that he was shocked

18

by the "arrogance and haughtiness" displayed by the adjusters during the trial, and by American National executive James Damron's responses to the following questions, asked by Goldstein during the punitive damages hearing:

Q: Do you think your company did anything wrong in the matter of handling the claim that is involved in this case regarding Charles Dees?

A: No.

Q: Would you do it the same way again, all over again? If it happened again, let's say in 1991?

A: No.

Q: What do you do differently?

A: Respond to the letter of arbitration [referring to Goldstein's November 1989 letter requesting arbitration].

American National argues that Damron could not have answered the first question affirmatively without admitting guilt, but Judge Langen took Damron's responses as evidence that something must be done to "get the attention of these people" and convey to them that "some changes in their investigative procedures are in order."

A district court judge, having heard the evidence and observed the witnesses, is in the best position to determine whether the requirements of proof of punitive damages have been met. Maddux v. Bunch (1990), 241 Mont. 61, 65, 784 P.2d 936, 939. Judge Langen's interpretation of Damron's testimony is consistent with the primary purpose of punitive damages, which is to punish a wrongdoer and deter further unlawful conduct, and we will not overrule it absent an abuse of discretion. Safeco Ins. Co. v. Ellinghouse (1986), 223 Mont. 239, 254, 725 P.2d 217, 227.

19

We conclude that the District Court did not err in not striking the jury award of punitive damages.

IV

Did the District Court err in awarding prejudgment interest on the punitive damages award?

In its final judgment, signed on April 21, 1992, the District Court ordered American National to pay interest at the rate of ten percent per annum on the compensatory and punitive damages assessed against it, from April 5, 1991--the date of the jury verdict--to the date of the final judgment.

Prejudgment interest on damages is controlled by § 27-1-211, MCA, which provides that:

> Every person who is entitled to recover damages certain or capable of being made certain by calculation and the right to recover which is vested in him upon a particular day is entitled also to recover interest thereon from that day . . . .

Because punitive damages must be reviewed by the trial court, they neither vest nor are capable of being made certain until the trial court completes its review and issues a final judgment. Prejudgment interest, therefore, is not available on a punitive damages award. See Maddux, 784 P.2d at 940, in which we upheld the district court's reduction of the jury award of damages and concluded that because the amount of damages was not clearly ascertainable until determined by the district court, prejudgment interest was not appropriate.

We reverse the District Court's award of prejudgment interest on $300,000 in punitive damages, at ten percent per annum from

20

April 5, 1991 to April 21, 1992.

V

Did the District Court err in reducing the jury award of punitive damages?

On cross-appeal, Dees urges this Court to reinstate the jury's punitive damages award of $575,000, which the District Court reduced to $300,000.

We have described punitive damages as "an extraordinary remedy, . . . [which] should be applied with caution, lest gendered by passion and prejudice because of the defendant's wrongdoing, the award becomes unrealistic or unreasonable." Ellinghouse, 725 P.2d at 226-227. Here, Judge Langen observed that "[t]he passion and prejudice can be particularly strong when the wrong is committed by a company with considerable financial power against a small farmer trying to make ends meet." He reduced the jury's punitive damages award from $575,000 to $300,000 because "[t]he wrong committed by the Defendant in this case certainly does not justify that [Dees] should receive a half million dollar windfall," though he said that the award should be "large enough to get the company's attention."

We established a standard for punitive damages in Ellinghouse, 725 P.2d at 227 (citation omitted), holding that "[p]unitive damages cannot be 'in excess of the amount necessary adequately to punish the defendant and serve as an example to it and others.'" We also imposed on the district court a duty to act when the award appears excessive or "'the recovery is so grossly disproportionate

21

as to raise a presumption that it is the result of passion or prejudice.'" Ellinghouse, 725 P.2d at 227 (citation omitted). Here, the District Court performed its duty: finding evidence of passion and prejudice, it reduced the jury's award.

Dees asks us to consider seven criteria set forth by the United States Supreme Court, in Pacific Mut. Life Ins. Co. v. Haslip (1991), 499 U.S. 1, ___, 111 S.Ct. 1032, 1045, 113 L.Ed.2d 1, 22, for determining whether a punitive damages award is reasonably related to the policy goals of deterrence and retribution. These criteria actually were established by the Alabama Supreme Court, whose ruling was upheld by the United States Supreme Court in Haslip because the seven criteria impose a "sufficiently definite and meaningful constraint on the discretion of Alabama fact finders in awarding punitive damages." Haslip, 111 S.Ct. at 1045.

Although the Haslip criteria correspond in many respects to the nine factors a Montana court must consider in reviewing a jury award of punitive damages under § 27-1-221(7), MCA, they are not identical. Dees urges us to adopt the Haslip criteria because they require the fact finder to consider the costs of litigation, a factor not included in § 27-1-221(7), MCA. Recalling that the District Court sustained American National's objection to evidence on Dees' costs and attorney's fees, Dees argues on appeal that:

> if the jury and the Trial Judge would have considered the fact of the cost of litigation not for the number of dollars, per se, involved, but for the showing of intent, malice and bullying by American National of its insured, then the amount of the jury award for punitive damages could very well have been reasonably higher . . . .

22

We are not persuaded by this argument. Montana's statutory criteria meet the due process requirements set forth in Haslip: they impose a definite and meaningful constraint on the fact finder's discretion in awarding punitive damages. Moreover, § 27-1-221(7)(b), MCA, permits the jury, or the court, to consider "any other circumstances that may operate to increase or reduce, without wholly defeating, punitive damages."

We hold that the District Court met the standard imposed by § 27-1-221(7)(c), MCA, by clearly stating its reasons for decreasing the jury award of punitive damages and demonstrating its consideration of each of the factors listed in § 27-1-221(7)(b), MCA.

We reverse the District Court's award of prejudgment interest on punitive damages and remand for an order consistent with this opinion. The District Court's order is affirmed in all other respects.

_____
                      Justice

We concur:

_____
      Chief Justice

_____
        Justices

23

Justice Karla M. Gray, specially concurring.


I concur in the Court's opinion, but feel compelled to address certain arguments advanced by American National (AN) in hopes of offering guidance or additional clarity in these difficult cases involving both a coverage question and questions of violations of § 33-18-242, MCA, of Montana's Unfair Trade Practices Act (the Act).

I begin by stating my view that Dees presented sufficient evidence in the form of documents, other witnesses not interviewed by AN and photographs to establish a violation of § 33-18-201(4), MCA, which forms the basis for this independent action brought pursuant to § 33-18-242, MCA. Such a violation must be established by proof that an insurer refused to pay a claim "without conducting a reasonable investigation based upon all available information." "Reasonableness" generally is a question of fact in Montana, and a jury could conclude, on the basis of Dees' evidence, that AN's investigation was not reasonable based upon all available information.

AN argues that no violation of the investigation requirement was established because Dees did not present any expert testimony that general adjustment procedures and practices were not followed and/or that industry standards relating to claims investigation and adjustment were not met. At least implicitly, it urges us to adopt a requirement that a plaintiff offer expert testimony in these

24

regards to establish a violation. We have not done so previously, and AN's arguments do not persuade us to do so here. This is not to say, however, that an insurer cannot introduce appropriate testimony or other evidence in attempting to negate proof of a violation of the Act based on denial of a claim without a "reasonable investigation based on all available information." Particularly where, as here, an insurer is faced with the possibility of punitive damages, it might well wish to do so.

I note, in this regard, that any such testimony or evidence would necessarily have to be relevant to the statutory language at issue. For example, if the industry standard required only that an adjuster consult a reference manual of some kind in order to determine whether hail damage occurred to a particular field, such an industry standard likely would be irrelevant under the "reasonable investigation based on all available information" standard required by § 33-18-201(4), MCA.

In addition to its arguments surrounding the "reasonable investigation" issue, AN presents arguments and cases seeking a more objective standard for the "reasonable basis in law or in fact" defense to liability under the Act. To clarify an initial point, I note that AN states several times that if it had a reasonable basis for contesting the claim, it cannot be found to have violated the Act. I disagree with this interpretation. As I read § 33-18-242, MCA, a jury could find violations of the Act and still determine that an insurer was not liable under the Act (for actual or punitive damages) on the basis that the insurer had

25

established the "reasonable basis" defense. This distinction, which may seem hypertechnical, is important to the following discussion.

AN urges us to adopt a more objective standard of "reasonableness" than currently exists. Specifically, it urges a return to the Britton standard of "unwarranted, unreasonable, and without justification." See Britton v. Farmers Ins. Group (1986), 221 Mont. 67, 721 P.2d 303. As AN concedes, however, Britton was a pre-§ 33-18-242, MCA, case. The case before us is a statutory claim. Furthermore, Britton was a "bad faith" case and § 33-18-242(3), MCA, explicitly prohibits bringing an action for bad faith in connection with the handling of an insurance claim. Thus, Britton has no application here.

Similarly, AN urges us to apply the "Dutton" or "Anderson" rule to the "reasonable basis" language contained in § 33-18-242(5), MCA. In National Sav. Life Ins. Co. v. Dutton (Ala. 1982), 419 So.2d 357, the Alabama Supreme Court required that a plaintiff bringing a "bad faith refusal" claim must prove a company had no legal or factual defense. The Wisconsin Supreme Court applies a similar standard to bad faith refusal to pay claims: among other things, a plaintiff must show the absence of a reasonable basis for denying benefits of a policy. See Anderson v. Continental Ins. Co. (Wis. 1978), 271 N.W.2d 368.

The first problem in adopting the "Dutton" or "Anderson" rule is the same as that noted above regarding Britton: Dutton and Anderson were bad faith cases. The case before us is a statutory

26

claim which does not necessarily correspond in all respects to bad faith cases.

Even more important, however, to adopt the "Dutton" or "Anderson" rule would require this Court to ignore the structure and language of § 33-18-242, MCA, in its entirety, and subsection (5) thereof in particular. The "reasonable basis" for denying a claim is a _defense_ to liability under § 33-18-242, MCA. Therefore, the "reasonable basis" defense contains no burden of proof to be met by a plaintiff; as is the case with defenses generally, the party asserting the defense has the burden of establishing it by a preponderance of the evidence. Application of the "Dutton" or "Anderson" rule would impose an affirmative duty on the _plaintiff_ to _disprove_ the existence of a "reasonable basis" to deny the claim. We cannot insert such a nonexistent burden into the statute; nor should we, given that the "reasonable basis" position is a _defense_ to liability. The positions advanced by AN are legislative matters, not matters appropriate for judicial grafting onto existing statutes.

A plaintiff who brings an action under § 33-18-242, MCA, may seek actual and punitive damages; both kinds of damages available in such an action are different from damages which may be awarded in a breach of contract claim for policy coverage. Actual damages may be awarded to the extent they "were proximately caused by the violation of subsection (1), (4), (5), (6), (9), or (13) of § 33-18-201." Section 33-18-242(4), MCA.

A plaintiff can recover punitive damages under § 33-18-242,

27

MCA, only upon several proofs: (1) a plaintiff must establish by a preponderance of the evidence that the insurer violated one or more specified subsections of § 33-18-201, MCA; and (2) a plaintiff must establish by clear and convincing evidence that the insurer acted with actual malice or actual fraud as defined in § 27-1-221, MCA. If a plaintiff meets these burdens, she or he may be awarded punitive damages.

An insurer can avoid an award of actual, or proximately caused, damages under § 33-18-242, MCA, by establishing that its conduct did not violate any of the specified subsections of § 33-18-201, MCA. Because imposition of punitive damages requires the two proofs set forth above, an insurer may avoid the imposition of punitive damages by establishing either that it did not violate the specified subsections or that it did not act with actual fraud or malice.

Finally, even if violations and actual fraud or malice are established, an insurer still may assert that it had a reasonable basis for contesting the claim made under the insurance policy. If an insurer can establish such a reasonable basis, it may not be held liable under § 33-18-242, MCA, at all. In other words, provided an insurer can prove to the satisfaction of the finder of fact that it had a reasonable basis for denying the claim, § 33-18-242(5), MCA, provides a complete defense to both actual and punitive damages under the Act.

Because reasonableness is a question of fact, it is for the trier of fact to weigh the evidence and judge the credibility of

the witnesses in determining whether the insurer had a "reasonable basis" for denying a claim. Thus, such determinations generally must be based on the facts and circumstances of each case.

_____
                Justice

Chief Justice J.A. Turnage and Justice James C. Nelson join in the foregoing special concurrence of Justice Karla M. Gray.

_____
              Chief Justice

_____
                Justice