No. 98-718

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 150

300 Mont. 91

3P. 3d 626

---

CHARLES K. WATTERS and JANET M. WATTERS,

Plaintiffs and Respondents,

v.

GUARANTY NATIONAL INSURANCE COMPANY,

a Colorado corporation,

Defendant and Appellant.

---

APPEAL FROM: District Court of the Eighteenth Judicial District,

In and for the County of Gallatin,

The Honorable Thomas A. Olson, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Guy W. Rogers (argued), Lisa A. Rodeghiero, Brown Law Firm, Billings, Montana

For Respondents:

Richard J. Andriolo, Daniel P. Buckley (argued), Berg, Lilly, Andriolo & Tollefsen, Bozeman, Montana

For Amici:

William Conklin, Conklin, Nybo, Leveque & Lanning, Great Falls, Montana (State Farm Mutual Automobile Insurance Company); Paul C. Meismer, Carey, Meismer & McKeon, Missoula, Montana (Montana Trial Lawyers Association); John E. Bohyer, Phillips & Bohyer, Missoula, Montana (Estate of Helen R. Hohstadt)

Heard: October 14, 1999

Submitted: November 18, 1999

Decided: June 6, 2000

Filed:

_____

Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 Guaranty National Insurance Company (Guaranty) appeals from an order issued by the Eighteenth Judicial District Court, Gallatin County, granting summary judgment in favor of Charles K. Watters and Janet M. Watters (Watters), and denying its cross-motion for summary judgment.

¶2 We affirm in part, reverse in part, and remand for further proceedings.

¶3 Guaranty has raised two issues which we restate as follows:

1. Once clear liability was established and damages undisputedly exceeded policy limits, did Guaranty violate Montana's Unfair Trade Practices Act by conditioning

the payment of policy limits on the Watters' agreement to provide a full and final release of all liability in favor of its insured?

**2. Did Guaranty have a reasonable basis in law or in fact for contesting the Watters' claim, and therefore may not be found liable for violating Montana's Unfair Trade Practices Act?**

## Factual and Procedural Background

¶4 Generally, the underlying facts are not in dispute and have been stipulated to pursuant to a November 2, 1998 judgment issued by the District Court.

¶5 On October 31, 1993, the Watters suffered serious physical injuries following a collision between their car and one driven by Robert O. Moore (Moore), near Bozeman, Montana. At the time, Moore was insured by Guaranty for the statutory mandatory minimum amounts of $25,000 for bodily injury per person, $50,000 for bodily injury per accident, and $10,000 for property damage.

¶6 Guaranty investigated the accident and determined that Moore was at fault and that the Watters' personal injury claims entitled them to Moore's policy limits of $50,000. By January 4, 1994, medical bills for the Watters had reached approximately $90,000. Ultimately, the Watters incurred in excess of $100,000 in medical bills.

¶7 Within one week of the accident, on November 5, 1993, Guaranty informed Moore that "should the claimant pursue recovery through a lawsuit, the possibility does exist that a judgment could be awarded against you in excess of your insurance coverage." Guaranty further informed Moore that he could obtain an attorney at his own expense to represent him regarding "any excess exposure which now exists or may exist in the future." Guaranty emphasized its insurance policy provision that "settlement of any claim or suit remains within the discretion of our company." This notice to Moore was followed up in a letter, dated February 17, 1994, in which Guaranty again advised Moore that Guaranty would not be liable for a judgment in excess of policy limits, and that Moore may wish to retain counsel at his expense, recognizing that "you or your attorney may disagree with the approach taken by Guaranty National."

¶8 With liability and entitlement to the policy limits clearly established, the Watters, in a December 23, 1993 letter, demanded payment of Moore's bodily injury policy limits of $50,000. The Watters would not, however, agree to execute a full and final release of all liability in favor of Moore. Counsel for Watters also notified counsel for Guaranty that

"any attempt to withhold payment to force a release would be an Unfair Claims Settlement Practice." Guaranty refused to pay the policy limits without a full and final liability release.

¶9 On January 5, 1994, the Watters filed suit for personal injuries against Moore in the Eighteenth Judicial District Court. In his February 22, 1994 Answer, filed by counsel for Guaranty on his behalf, Moore admitted fault for the accident. By this time, both Guaranty and the Watters realized that Moore had no assets to contribute to an excess judgment. During this time, counsel for Watters reached a claim settlement with Guaranty for $9,161.07 under Moore's $10,000 property damage coverage. This settlement, however, apparently did not involve an absolute liability release that affected the bodily injury coverage portion of Moore's policy with Guaranty.

¶10 In an exchange of letters of negotiation during 1994, Guaranty continued to offer to pay the policy limits, but not unless the Watters agreed to execute a full and final liability release in favor of Moore. Throughout this period, Guaranty asserted that its primary obligation was to protect the interests of its insured. Guaranty informed the Watters that if it paid them Moore's policy limits, it would no longer have an obligation to defend Moore in the lawsuit. Moore's policy with Guaranty stated that "[o]ur payment of the limits of liability ends our duty to defend or settle, but the tender of the limits of liability before a judgment or settlement does not relieve us of our duty to defend." Under the same Part, the policy provided that "[w]e will defend any such suit at our own expense, with counsel of our choice, or, as we deem appropriate, we may settle any claim or suit."

¶11 In turn, the Watters offered to accept $49,950--$50 below the policy limits--thereby allowing Guaranty to continue its obligation to defend its insured, yet still make a prompt payment to the Watters. The Watters further offered that they would execute a partial release to the extent of this payment by Guaranty.

¶12 Guaranty rejected this offer, and reaffirmed that a full and final release must be agreed to before any policy proceeds would be released to the Watters. Guaranty also asserted that paying the policy limits without a full release would essentially place it in the role of funding the Watters' litigation against Moore, which would be an act of bad faith. Guaranty did, however, suggest two other options: (1) depositing the $50,000 with the court pending a declaratory judgment action to determine the respective party's rights and obligations; and (2) deposing Moore so that the Watters could be satisfied that he did not have sufficient assets to pay any excess judgment against him.

¶13 On October 14, 1994, the Watters filed suit against Guaranty, alleging breaches of Montana's Unfair Trade Practices Act (UTPA), under § 33-18-201(6) and (13), MCA. Guaranty asserted in its Answer that, due to Moore's and his attorney's demand that Guaranty secure a full release for Moore, its primary obligation was to protect his interests and provide him with a defense in the underlying lawsuit. The Answer also included an admission that Moore was "responsible for reasonable damages proximately resulting from the accident."

¶14 By December of 1994, Guaranty retained an attorney to defend Moore in the personal injury lawsuit pursuant to its contractual obligations under Moore's policy. Consequently, Moore, through his counsel, demanded that Guaranty continue to defend Moore until he received an unconditional release. Contrary to Guaranty's October 14th Answer, however, it is unclear that Moore ever made a demand for an absolute release prior to this time.

¶15 The Watters filed for summary judgment in their UTPA claim against Guaranty on January 25, 1995. Guaranty filed a cross-motion for summary judgment on March 13, 1995.

¶16 On March 8, 1995, the policy limits of $50,000 were "tendered" by Guaranty to the court in the Watters' personal injury lawsuit against Moore. At this time, counsel for Moore also asserted that Moore was considering bankruptcy, hoping to discharge any judgment that exceeded the policy limits. The Watters were also informed that the $50,000 policy limits may be exposed to demands by other creditors should the bankruptcy action proceed. Although denied at oral argument before this Court, the record indicates that counsel for Moore believed that Guaranty was willing to pay the costs and fees associated with Moore's bankruptcy, and testified to this fact in his deposition.

¶17 On May 11, 1995, approximately one-and-a-half years after the accident, the Watters executed a full and final liability release in favor of Moore, reserving any and all claims against Guaranty. The Watters asserted they took this action because they were in financial need due to medical creditor claims, as well as the uncertainty presented by Moore's potential action in bankruptcy. On May 12, 1995, the parties signed a stipulation distributing the policy limits of $50,000 plus interest to the Watters.

¶18 On June 7, 1996, the District Court granted the Watters' motion for summary judgment and denied Guaranty's cross-motion for summary judgment. In doing so, the court determined that Guaranty had engaged in an unfair claims settlement practice in

violation of UTPA, in that it had a "duty to release the funds in this case." The court agreed with the Watters' argument that UTPA requires insurance carriers to effectuate prompt and fair settlements, and this requirement "takes precedence over the private contractual agreement to defend between a carrier and its insured." The court also relied on a similarly decided case from Massachusetts, *Thaler v. American Ins. Co.* (Mass.App. Ct. 1993), 614 N.E.2d 1021. With liability established, the only issue remaining for determination at trial was damages.

¶19 On November 2, 1998, the court entered a judgment against Guaranty in favor of the Watters for $110,000, pursuant to the parties' stipulation on damages. The parties agreed to stipulate to this sum, pending the outcome of this appeal, in order to avoid trial if remand was necessary. Guaranty placed this sum with the District Court. This cause was heard on oral argument October 14, 1999.

### Standard of Review

¶20 This Court reviews an order granting summary judgment *de novo* under Rule 56, M.R. Civ.P., by utilizing the same criteria as the district court. *See Treichel v. State Farm Mut. Auto. Ins. Co.* (1997), 280 Mont. 443, 446, 930 P.2d 661, 663. Summary judgment is a remedy which should be granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), M.R.Civ.P. The procedure should never be substituted for trial if a material factual controversy exists. *See Payne Realty v. First Sec. Bank* (1993), 256 Mont. 19, 24, 844 P.2d 90, 93.

¶21 Here, the parties have stipulated to all material facts. Therefore, we will review this matter to determine whether the Watters are entitled to judgment as a matter of law. On review, all reasonable inferences that might be drawn from the offered evidence should be drawn in favor of the party opposing summary judgment. *See Payne*, 256 Mont. at 24-25, 844 P.2d at 93. Further, we have held that this Court may reverse a district court's order granting summary judgment and order it to enter summary judgment in favor of the other party when there are no issues of material fact and all of the facts bearing on the issues are before the court. *See Kenner v. Moran* (1994), 263 Mont. 368, 375, 868 P.2d 620, 624.

¶22 Accordingly, if we determine that as a matter of law Guaranty violated UTPA as alleged and subsequently determined by the District Court, summary judgment in favor of the Watters will be proper. The stipulated judgment should then be entered as final in their favor. If, on the other hand, we determine subject to our *de novo* review that, as a matter of

law, Guaranty did not violate UTPA when it refused to pay the policy limits to the Watters, or that its affirmative defense excuses any violation, this matter will be remanded for dismissal of the stipulated judgment.

## DISCUSSION

¶23 The focal issue presented here posed a Hobson's choice for each party.

¶24 Guaranty had to choose between either making payment of policy limits to the Watters without obtaining a full and final liability release--which allegedly would have given rise to a bad faith or breach of contract claim by its insured--or withholding payment pending the outcome of litigation, which potentially would have given rise to an unfair trade practice claim by the Watters. As case law from other jurisdictions makes clear, Guaranty is by no means the first insurer to find itself in this catch-22. *See*, *e.g.*, *Lehto v. Allstate Ins. Co.* (Cal.Ct.App. 1994), 36 Cal.Rptr.2d 814, 823; *Gallagher v. Allstate Ins. Co.* (N.D.W.Va. 1999), 74 F.Supp.2d 652, 656.

¶25 Relying on our decision in *Juedeman v. National Farmers Union* (1992), 253 Mont. 278, 833 P.2d 191, Guaranty chose the latter course of action, and, as predicted, the Watters brought this unfair trade practice claim. Guaranty asserts that by following the clear rule set forth in *Juedeman*, at the time, it did not act in bad faith in denying the Watters' claim because it had, pursuant to § 33-18-242(5), MCA, a "reasonable basis in law" for the difficult choice it made, and in good faith considered its insured's interests.

¶26 The Watters' choices were equally unenviable. As innocent parties, the Watters were required to choose either incomplete compensation for severe and permanent injuries caused by another person who had admitted full liability, or proceed into potentially prolonged litigation without the resources necessary to fulfill their current obligations resulting from their injuries. Indeed, this dispute has now entered its sixth year and from the record it is clear that the Watters suffered potentially noncompensable damage to their economic well being, once medical-bill creditors pursued payment for the debts incurred. Further, agreeing to such a full and final release could have interfered with their own insurer's subrogation rights, and thereby jeopardized the Watters' rights to underinsured coverage pursuant to the terms of their policy. Equally clear, is the fact that staving off such damages factored into the Watters' agreement to release Moore in exchange for policy limits in May of 1995. Either choice seemingly defies the legal principles that for every wrong there is a remedy, *see* § 1-3-214, MCA; *STC, Inc. v. City of Billings* (1975),

168 Mont. 364, 372, 543 P.2d 374, 378, and that a tortiously injured party should be returned to his or her rightful position that "the party would have attained had the wrong not occurred." *Butler v. Germann* (1991), 251 Mont. 107, 110, 822 P.2d 1067, 1069.

¶27 Regardless of the outcome here, this case requires that we clarify prior case law that does not squarely provide a clear rule upon which parties such as Guaranty and the Watters may rely under these specific factual circumstances. Namely, at the behest of the parties, we must reconcile today any conflict between our decisions in *Juedeman* and *Ridley v. Guaranty Nat. Ins. Co.* (1997), 286 Mont. 325, 951 P.2d 987, in the context of Montana's Unfair Trade Practices Act, which governs the business of insurance, as well as public policy under Montana's Motor Vehicle Safety-Responsibility Act. In doing so, we must determine several corollary legal issues pertaining to what constitutes bad faith on the part of insurers in Montana. Thus, we proceed to the issues.

## ISSUE 1

*Once clear liability was established and damages undisputedly exceeded policy limits, did Guaranty violate Montana's Unfair Trade Practices Act by conditioning the payment of policy limits on the Watters' agreement to provide a full and final release of all liability in favor of its insured?*

¶28 As argued by both parties, this issue must first be properly cast within the framework of Montana's Motor Vehicle Safety-Responsibility Act. Specifically, under § 61-6-103, MCA, all owners and operators of motor vehicles must carry mandatory liability insurance, in the minimum amounts of $25,000 "because of bodily injury to or death of one person in any one accident;" $50,000 "because of bodily injury to or death of two or more persons in any one accident," and $10,000 "because of injury to or destruction of property of others in any one accident." *See* § 61-6-103(2)(b)(i)-(iii), MCA. Under this Act, the "liability of the insurance carrier with respect to the insurance required by this part becomes *absolute* whenever injury or damage covered by the motor vehicle liability policy occurs." *See* § 61-6-103(6)(a), MCA (emphasis added). This standard of absolute liability does not apply to insurance coverage that exceeds the mandatory minimum limits. *See* § 61-6-103(8), MCA.

¶29 Further, we have held that "[i]t is clear that the mandatory liability insurance law seeks to protect members of the general public who are innocent victims of automobile accidents," and that § 61-6-301, MCA, "was enacted for the benefit of the public and not

for the benefit of the insured." *Iowa Mut. Ins. Co. v. Davis* (1988), 231 Mont. 166, 170-71, 752 P.2d 166, 169. *See also Ridley*, 286 Mont. at 335, 951 P.2d at 993 (citing *Iowa Mutual* and interpreting UTPA, subsection (6) of § 33-18-201, MCA, as assuring prompt payment of damages for which an insurer is clearly obligated).

¶30 The insurance policy at issue here provided only the statutory minimum amounts of insurance. Accordingly, the discussion and holdings herein are limited by the foregoing, and specifically limited to those claims for damages brought by a third-party claimant against a clearly liable party and his or her automobile liability insurer, and only for the mandatory coverage limits required under § 61-6-103(2), MCA.

## A. Defining "Settlements" under UTPA

¶31 In this matter, a preliminary battle of semantics is inevitable. Subsection (6) of § 33-18-201, MCA, provides that no insurer may "neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." The term "settlement" is not defined under UTPA, or under statutory provisions governing motor vehicles or the insurance trade in Montana.

¶32 According to Guaranty's version of the insurance trade's lexicon, "payment" of policy limits is not a "settlement" unless the third-party claimant executes a full and final release of all liability in favor of the insured. In support of its position, Guaranty relies on *Juedeman*, where this Court concluded that "without an agreement to release, there is no offer for settlement," and consequently no viable claim of bad faith against the insurer for refusing such an offer, under § 33-18-201(6), MCA. *Juedeman*, 253 Mont. at 281, 833 P.2d at 193 (citing *Thompson v. State Farm Mut. Auto. Ins. Co.* (1973), 161 Mont. 207, 219-20, 505 P.2d 423, 430).

¶33 In *Thompson*, from which we derived this rule, we explained that even an insurance company's refusal of a claimant's offer of a covenant not to sue could not be construed as a bad faith refusal of a "settlement offer." We stated that "[h]ad State Farm accepted that offer, it would not have been protecting Thompson [its insured] under the circumstances." Accordingly, no "offer of settlement" was ever made by the third-party claimant. *Thompson*, 161 Mont. at 219, 505 P.2d at 430.

¶34 Guaranty also directs our attention to other jurisdictions, which also purportedly conclude that a full and final release of an insured is the *sine qua non* of a "settlement."

*See*, *e.g.*, *Lazaris v. Metropolitan Property & Cas. Ins. Co.* (Mass. 1998), 703 N.E.2d 205, 207 (stating that "to pay without a release is not a settlement" and "settlement typically involves the 'release or termination of further claims against the tortfeasor'") (citations omitted); *Trinity Universal Ins. Co. v. Bleeker* (Tex. 1998), 966 S.W.2d 489, 491(stating that under the common law "Stowers" doctrine, a settlement demand must propose to release the insured fully in exchange for a stated sum of money).

¶35 Under the facts here, according to Guaranty, by definition no "settlement" was ever proffered from the Watters' side of the negotiation table. Thus, as a matter of law Guaranty could not have violated UTPA, under § 33-18-201(6), MCA, by flatly refusing any overtures of payment that did not provide an absolute release of all liability. Rather, Guaranty's argument suggests that under the holding in *Juedeman*, the party that should shoulder the blame for not effectuating a prompt settlement is the Watters, not Guaranty, because they are the ones who refused the only legitimate "settlement" offer: policy limits in exchange for a full and final release.

¶36 Guaranty's position overlooks one minor facet of this matter: Guaranty promptly reached a "settlement" with the Watters in January of 1994. Guaranty agreed to pay the Watters $9,161.07 for property damage within Moore's mandatory minimum $10,000 policy limits. This "settlement" was apparently achieved without the Watters executing a full and final release of all further liability in Moore's favor, or Guaranty balking at such a settlement.

¶37 That circumstances may arise where a "settlement" may be reached without a full and final release of all liability, as the property "settlement" suggests, comports with our discussion of this term in *Ridley*. In that case, the appellant, Ridley, contended that Guaranty was liable for medical expenses caused by its insured when liability was reasonably clear, without regard to whether a final settlement was or could be agreed upon, because subsection (6) of § 33-18-201, MCA, by its plain language, makes no reference to a final settlement of all claims, but refers instead to "settlements." *Ridley*, 286 Mont. at 333, 951 P.2d at 991. We agreed with Ridley, and concluded that both subsections (6) and (13) of § 33-18-201, MCA, by their terms imposed an obligation to make payments for medical expenses in advance of final settlement. *Ridley*, 286 Mont. at 334, 951 P.2d at 992. We further concluded that the language of § 33-18-201(6), MCA, did not impose a requirement that *all disputes* or *all claims* be resolved between two parties. *Ridley*, 286 Mont. at 334, 951 P.2d at 992.[(1)]

¶38 We also noted in *Ridley* that the clear language of subsection (13), under § 33-18-201, MCA, provides that one auto accident or "occurrence" may produce more than one claim against an insurer, which in turn may produce more than one settlement under more than one portion of "the insurance policy coverage." *See* § 33-18-201(13), MCA (prohibiting the failure to "promptly settle *claims*, if liability has become reasonably clear, under one portion of the insurance policy coverage in order to influence *settlements* under other *portions* of the insurance policy coverage) (emphasis added). *See also* 46A C.J.S. *Insurance* § 1351 (1993) (stating that a settlement with respect to one item of loss does not preclude recovery on the policy with respect to other items, and "[a]n insurance company by settling one claim arising from an occurrence, may still deny coverage as to another claim arising from the same occurrence"). As explained above, this was precisely the nature of the "settlement" for property damage under Moore's policy, which partially discharged his obligation to the Watters for damages arising from the one accident without a full and final release of all other liability.

¶39 The foregoing reasoning in *Ridley* accords with the general, governing principles of contract law from which the law of settlements is derived. A release, as a matter of law, is nothing more than an accord and satisfaction, or, one of several ways in which an obligation, contractually, may be discharged or "settled" for less than or for something different than what is owed. *See* § 28-1-1401 and 1402, MCA (describing accord and satisfaction); *Hetherington v. Ford Motor Co.* (1993), 257 Mont. 395, 401-402, 849 P.2d 1039, 1043-44 (distinguishing executory accord from substituted contract). *See also* § 28-1-1502 (describing kinds of novation); § 28-1-1601 (describing extinction of an obligation by a release); 66 Am.Jur.2d *Release* § 1 (1973) (distinguishing between a release and a "settlement," and providing that a settlement often involves a "payment, a release, a covenant not to sue, a promise to discontinue a pending suit, or a receipt").

¶40 On the other hand, the term "settlement" as used throughout UTPA is synonymous with an enforceable bilateral contract that discharges a future or existing obligation. *See Carlson v. State Farm Mut. Auto. Ins. Co.* (D.Mont. 1999), 76 F.Supp.2d 1069, 1079; 46A C.J.S. *Insurance* § 1348 (1993) (stating that a compromise or settlement "must have all the essential elements of a contract," and its validity is not affected "by whether the settlement is favorable or unfavorable to the insured"). Accordingly, a claim brought by a third party demanding payment of an insured's policy limits may be "settled" with the insurer within the meaning of UTPA, if the resulting agreement vests the parties with the right to enforce the "settlement" by bringing an action for breach of contract. *See Carlson*, 76 F.Supp. at 1079. The early "settlement" for property damage in this matter epitomizes this very point.

¶41 Based on the foregoing, we conclude that to absolutely require that a "settlement" between a third-party claimant and a clearly liable party's insurer, under all circumstances, must include as a material element a full and final release of all liability would add judicial gloss to the statutory language of § 33-18-201(6), MCA--a gloss that has been applied, we might add, in other jurisdictions for the necessary sake of maintaining a bright, albeit harsh, line in their bad faith jurisprudence. *See*, *e.g.*, *Lazaris*, 703 N.E.2d at 206-207 (determining *sua sponte* in a case where liability was *unclear*, that payment of claims without a full release in cases where liability *is clear* does not constitute a "settlement").[2] As this Court has often expressed, in a variety of applications, mere technicalities that threaten to diminish the ends of substantial right and justice must be avoided. *See*, *e.g.*, *Waggoner v. Glacier Colony of Hutterites* (1953), 127 Mont. 140, 150, 258 P.2d 1162, 1167. Likewise, a statute is to be "read as a whole and construed so as to avoid absurd results." *Clover Leaf Dairy v. State* (1997), 285 Mont. 380, 388-89, 948 P.2d 1164, 1169 (citation omitted).

¶42 By concluding that a "settlement" between the Watters and Guaranty, under § 33-18-201(6), MCA, for the payment of policy limits was legally possible without the Watters executing a full and final release of all liability, we must necessarily turn to the issue of whether the execution of such a "settlement" by Guaranty would have *per se* breached its duty of good faith owed to its insured.

## B. Guaranty's Potential "Bad Faith" Liability

¶43 Guaranty strenuously argues that had it paid the policy limits to the Watters without obtaining in return a full and final release of all liability for its insured, "it undoubtedly would have been sued by Moore for 'bad faith' and breach of the insurance contract." Thus, Guaranty contends that it had no choice but to protect the interests of its insured under the circumstances. The underlying rationale, Guaranty maintains, is that it simply cannot place the interests of a third-party claimant above those of its insured to whom it owes a fiduciary duty. We conclude that in this particular instance, Guaranty's "catch-22" is illusory, at best.

¶44 Guaranty's alleged liability for bad faith is based on a reasonable forecast of future events: after payment of the $50,000 policy limits, Moore would have been "hung out to dry" for whatever judgment in excess of this amount the Watters could obtain, and quite possibly without the assistance of counsel provided under his policy with Guaranty. However, precisely on what grounds this predicament would have confounded Moore's

reasonable expectations under his policy with Guaranty, and consequently given rise to a viable bad faith claim under UTPA is less than clear. *See generally American Family Mut. Ins. Co. v. Livengood*, 1998 MT 329, ¶ 32, 292 Mont. 244, ¶ 32, 970 P.2d 1054, ¶ 32 (providing that insured's expectations of policy "should be honored notwithstanding the fact that a painstaking study of the policy would have negated those expectations").

¶45 First, several of the decisions from courts which Guaranty assert constitute a "majority rule" do not address the same factual scenario as here. As mentioned earlier, one court resolved the issue *sua sponte*. *See Lazaris*, 703 N.E.2d at 207. Others were concerned with the issue of multiple insureds under one policy. *See Lehto v. Allstate Ins. Co.* (Cal.Ct.App. 1994), 36 Cal.Rptr.2d 814 (insurer does not commit bad faith by refusing third-party claimant offer to release one of two joint tortfeasors); *Strauss v. Farmers Ins. Exch.* (Cal. Ct.App. 1994), 31 Cal.Rptr.2d 811 (claimant offers to release one of three joint tortfeasors); *Premier Ins. Co. of Mass. v. Furtado* (Mass. 1998), 703 N.E.2d 208 (multiple insureds).

¶46 Still others do not address a common law or statutory claim for bad faith. *See Trinity Universal Ins. Co. v. Bleeker* (Tex. 1998), 966 S.W.2d 489, 491 (discussing common law "Stowers" duty owed to insured under negligence theory).

¶47 Further still, those "majority rule" courts that were actually faced with similar facts as those identified here decided the issue based on the holdings from the foregoing courts without distinguishing the facts. *See, e.g., Gallagher v. Allstate Ins. Co.* (N.D.W.Va. 1999), 74 F.Supp.2d 652, 656 (citing *Strauss*, *Lehto*, and *Lazaris*).

¶48 Finally, others simply offered the "majority rule" via dictum. *See Pareti v. Sentry Indem. Co.* (La. 1988), 536 So.2d 417, 424 (suggesting, but not holding, that payment of policy limits which does not release the insured from a pending claim raises "serious questions" as to whether insurer discharged its policy obligations in good faith); *Cook v. Trinity Universal of Kansas* (Ala. 1991), 584 So.2d 813, 815 (stating that it is "wise" to demand that the creditor, as a condition of settlement, sign a release acknowledging extinguishment of the debt).

¶49 On the other hand, several courts which have addressed factual circumstances identical to those found here have decided the issue of "full liability release in exchange for policy limits" in favor of the third-party claimant. *See Blank v. USAA Property & Cas. Ins. Co.* (Wis.Ct.App. 1996), 546 N.W.2d 512, 514-15 (concluding that an insurer has "no

reasonable grounds to fear a bad faith claim" where policy limits of $100,000 are paid without a full release, and jury awards third-party claimant plaintiff $7.5 million); *Dairyland Ins. Co. v. Herman* (N.M. 1997), 954 P.2d 56, 64 (concluding that the duty to an insured does not mandate an "all-or-nothing approach" where recovery of third party likely will exceed policy limits); *Thaler v. American Ins. Co.* (Mass.App.Ct. 1993), 614 N. E.2d 1021, *overruled by Lazaris v. Metropolitan Property & Cas. Ins. Co.* (Mass. 1998), 703 N.E.2d 205.

¶50 Aside from the applicability of a "majority rule" to the factual scenario here, all of the foregoing jurisdictions are clearly distinguishable from such disputes arising in Montana. In 1987, our Legislature provided insurers such as Guaranty with the following protection from bad faith claims under either the common law or UTPA:

> An insured who has suffered damages as a result of the handling of an insurance claim may bring an action against the insurer for breach of the insurance contract, for fraud, or pursuant to this section, but not under any other theory or cause of action. *An insured may not bring an action for bad faith in connection with the handling of an insurance claim.*

Section 33-18-242(3), MCA (emphasis added). *See also O'Fallon v. Farmers Ins. Exch.* (1993), 260 Mont. 233, 243-44, 859 P.2d 1008, 1014-15 (discussing the legislative history of § 33-18-242, MCA, and identifying the limitation of the types of claims that could be brought against insurers as one of its purposes). Section 33-18-242(3), MCA, is a unique feature in contrast to other states, such as Massachusetts and California, that have similar unfair trade practices acts governing their insurance businesses where bad faith claims remain virtually unimpeded.

¶51 Confronted with such statutory plain language, we will not second guess the intent of the Legislature in its desire to explicitly limit the liability of insurers. *See State Bar of Montana v. Krivec* (1981), 193 Mont. 477, 481, 632 P.2d 707, 710 (citation omitted). *See also Meech v. Hillhaven West, Inc.* (1989), 239 Mont. 21, 32, 776 P.2d 488, 494 (providing that the "law of Montana has long recognized that the courts and the legislature establish the substantive law governing tort claims"). Thus, we have stated that § 33-18-242(3), MCA, "explicitly prohibits bringing an action for bad faith in connection with the handling of an insurance claim." *Dees v. American Nat. Fire Ins. Co.* (1993), 260 Mont. 431, 450, 861 P.2d 141, 153 (Gray, J., concurring). We have distinguished this prohibition by concluding that the subsection "prohibits an insured, but not a third-party claimant,

from bringing an action for bad faith." *Brewington v. Employers Fire Ins. Co.*, 1999 MT 312, ¶ 13, 297 Mont. 243, ¶ 13, 992 P.2d 237, ¶ 13.

¶52 Guaranty's reasoning is therefore unclear as to how Moore, as an insured who had yet to suffer damage as a result of Guaranty's "handling" of the Watters' claim, could bring an action for "bad faith" under UTPA had Guaranty paid the undisputed full policy limits without obtaining a full release of liability on his behalf. Although providing some evidence of veiled threats of litigation asserted by Moore's attorney, Guaranty has not provided one decision from Montana or elsewhere where such a claim was made under these particular facts, let alone one in which the insured prevailed. *See*, *e.g.*, *Blank*, 546 N. W.2d at 515 (reviewing Louisiana and California case law and concluding that "no cases recognize a bad faith claim" where damages are in excess of policy limits, liability is not in doubt, the insurer uses reasonable efforts to settle and then accepts claimant's offer to settle without a full release).

¶53 Additionally, the demands made by counsel for Moore are rather hollow. First, these demands did not enter the picture until December of 1994, approximately one year into the negotiation process and several months after the Watters filed their UTPA claim. Secondly, Moore's attorney, although exercising independent judgment on behalf of Moore, was paid by Guaranty pursuant to its duty to defend, a duty that would certainly not include financing a bad faith or breach of contract action against Guaranty, nor, for that matter, an action in bankruptcy.

¶54 Guaranty, in fact, evidenced signs of acting in good faith toward its insured when it informed Moore within one week of the accident that he should consider seeking legal counsel, at his own expense, to address the issue of his own liability that would exceed the policy limits. There is likewise substantial evidence that Guaranty fully informed its insured throughout this matter, and dutifully investigated the Watters' claim for policy limits. Further, Moore purchased insurance coverage limited to the statutory minimums. If and when these limits were paid, he would have realized the full benefit of the coverage for which he had paid premiums: a reduction of the total personal injury damages he caused by $50,000.

¶55 While we have recognized the reasonable expectations doctrine, s*ee American Family*, ¶ 32, we have also concluded that this doctrine is inapplicable where the terms of the policy at issue clearly demonstrate an intent to exclude coverage. *See American Family*, ¶ 33. Thus, Moore could not reasonably have expected under such circumstances that

Guaranty would be obligated to, in effect, provide greater coverage than that purchased in the issued policy by demanding a full release of all liability as a condition of paying the limits of the minimum coverage which he had purchased.

¶56 Undoubtedly, where the monetary consequences of a person's tortious conduct undisputedly exceed policy limits, and liability is clear, the only incentive for an injured third-party claimant to settle for policy limits and provide the insured with an absolute release is some form of coerced economic necessity. In *Ridley*, we addressed this very subject and stated:

> Medical expenses from even minor injuries can be devastating to a family of average income. The inability to pay them can damage credit and, as alleged in this case, sometimes preclude adequate treatment and recovery from the very injuries caused. Just as importantly, the financial stress of being unable to pay medical expenses can lead to the ill-advised settlement of other legitimate claims in order to secure a benefit to which an innocent victim of an automobile accident is clearly entitled. We conclude that this is not what was intended by the Montana Legislature when mandatory liability insurance laws and unfair claims practice laws were enacted.

*Ridley*, 286 Mont. at 335, 951 P.2d at 993. Absent such necessity, and where damages are twice, ten, or one hundred times the mandatory limits imposed by law, such an absolute release is an absurdity, and potentially raises the issue of whether such a release would be unconscionable as a matter of law.[(3)]

¶57 Accordingly, we conclude that compelling an innocent third-party claimant, under the circumstances described here, to proceed to trial to recoup that which is already owed is entirely inconsistent with the declared public policy of Montana to encourage settlement and avoid unnecessary litigation. *See generally Augustine v. Simonson* (1997), 283 Mont. 259, 266, 940 P.2d 116, 120. While we agree with Guaranty that it must consider the interests of its insured, we hold that the payment of policy limits under these particular factual circumstances would not have exposed Guaranty to *per se* liability for bad faith.

## C. Guaranty's Potential "Breach of Contract" Liability

¶58 Whether a breach of contract may have occurred is equally unclear and of little concern here. As we have stated, it is "axiomatic that laws established for the benefit of

the public cannot be contravened by private contract." *Iowa Mutual*, 231 Mont. at 171, 752 P.2d at 169. In light of this policy, the Montana Legislature has required that insurance companies in good faith promptly settle claims with third parties, such as the one brought here by the Watters, when liability has become reasonably clear.

¶59 Furthermore, a contractual duty to secure a third-party's absolute release is not mentioned once in Guaranty's policy. Rather, the policy explicitly states that Guaranty would "pay damages for which any insured person is legally liable because of bodily injury and property damage caused by a car accident . . ." Guaranty had the right to "settle any claim or suit" and the "payment of the limits of liability ends our duty to defend or settle." As previously addressed, expectations which are contrary to a clear exclusion from coverage are not objectively reasonable. *See American Family*, ¶ 33.

## D. Summary

¶60 In summary, we hold that where liability resulting from an automobile accident is reasonably clear, and a third-party claimant's damages undisputedly exceed mandatory minimum policy limits pursuant to § 61-6-103, MCA, the prompt, fair, and equitable settlement of such claims cannot be forestalled by an insurer based on an illusory bad faith or breach of contract claim that its insured may bring. To refuse payment based on such unfounded potential liability is, in and of itself, a deceptive practice within the meaning of § 33-18-201(6), MCA.

¶61 Further, we hold that where an insured's liability for damages caused to a third party in an auto accident is reasonably clear, and those damages undisputedly exceed the mandatory limits set forth under § 61-6-103(2), MCA, it is an unfair trade practice *per se* under § 33-18-201, MCA, for an insurer to condition the payment of the owed mandatory minimum policy limits on the third party's agreement to provide a full and final release of all liability in favor of an insured. To this extent, we affirm the summary judgment order of the District Court. To hold otherwise, under the specific facts here, would render our mandatory liability insurance law, which was "enacted for the benefit of the public and not for the benefit of the insured," meaningless. *Iowa Mutual*, 231 Mont. at 171, 752 P.2d at 169.

¶62 Accordingly, we conclude that an insurer, who pays mandatory minimum policy limits that are owed under the circumstances herein described, does not act in bad faith *per se* against its insured by not obtaining a full and final liability release on the insured's

behalf. This ruling is by no means intended to foreclose any or all bad faith claims--including those related to the duty to defend--that an insured may bring against its insurer for conduct prior to or following the handling of an insurance claim.

¶63 We overrule and distinguish *Juedeman* as well as *Thompson* to the extent those decisions are inconsistent with this opinion. Namely, the insurer in *Juedeman*, under our decision here today, would commit an unfair trade practice *per se* by withholding those policy proceeds under its coverage that are mandated pursuant to § 61-6-103(2), MCA. Thus, our decision here does not affect excess coverage that an insured chooses to carry, pursuant to § 61-6-103(8), MCA. *Thompson* is overruled to the extent it suggests that a third-party claimant's full and final release of an insured's liability is, as a matter of law, a material element of a "settlement" under the UTPA.

## ISSUE 2

*Did Guaranty have a reasonable basis in law or in fact for contesting the Watters' claim, and therefore may not be found liable for violating Montana's Unfair Trade Practices Act?*

¶64 Guaranty contends that even if we overrule *Juedeman*, and thereby broaden and clarify our decision in *Ridley*, we must nevertheless reverse summary judgment because although engaging in an unfair settlement practice, Guaranty had a "reasonable basis in law or in fact" for contesting the Watters' claim.

¶65 In addition to limiting the liability of insurers for bad faith in 1987, the Legislature also provided insurers with an affirmative defense under § 33-18-242(5), MCA. This provision provides that "[a]n insurer may not be held liable under this section if the insurer had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue."

¶66 Guaranty maintains that at the very least, our decision in *Juedeman* during the relevant period of 1993-95, was the undisputed law in Montana. The Watters, on the other hand, assert that *Juedeman* did not at any time control the circumstances of this case, and therefore it could not provide a reasonable basis for Guaranty's refusal to pay the policy limits. The District Court, in its summary judgment order, did not explicitly determine whether Guaranty's defense, under § 33-18-242(5), MCA, failed as a matter of law.

¶67 As we have stated before, the party asserting this defense has the burden of establishing it by a preponderance of the evidence. *Dees v. American Nat. Fire Ins. Co.*

(1993), 260 Mont. 431, 451, 861 P.2d 141, 153 (Gray, J., concurring). Consequently, we have held that whether an insurer has a "reasonable basis" is generally a question of fact, and cannot be made "as a matter of law." *Dean v. Austin Mut. Ins. Co.* (1994), 263 Mont. 386, 389, 869 P.2d 256, 258. The insurer in *Dean*, for example, contested coverage based solely on the fact that the insureds had been charged with felony arson, and subsequently argued that this served as a reasonable basis for it denying coverage up until the time that the Deans were acquitted, reasoning that the policy excluded from coverage acts of arson. *Dean*, 263 Mont. at 387-88, 869 P.2d at 257. Under those circumstances, we concluded that whether the insurer had a reasonable basis in law or in fact was an issue properly presented for determination to the trier of fact. *Dean*, 263 Mont. at 389, 869 P.2d at 258.

¶68 In a recent *de novo* review of a district court's summary judgment, however, we determined that an insurer clearly had a reasonable basis in law for not paying its insured's claim for insurance proceeds, and affirmed without requiring that the insurer's conduct reach the trier of fact. *See Bartlett v. Allstate Ins. Co.* (1996), 280 Mont. 63, 70, 929 P.2d 227, 231 (concluding that claimant as a matter of law did not have an insurable interest in damaged property, and therefore insurer clearly had a reasonable basis for not paying claim). *See also Watts v. Westland Farm Mut. Ins. Co.* (1995), 271 Mont. 256, 263, 895 P.2d 626, 630 (affirming summary judgment in favor of insurer where insurance policy was as a matter of law not in effect at time of insured's loss, and therefore denial of claim was reasonable).

¶69 Thus, the "trier of fact" rule set forth in *Dean* is not necessary in a summary judgment proceeding where the underlying "basis in law" is grounded on a legal conclusion, and no issues of fact remain in dispute. Here, therefore, it is for the court, not the trier of fact, to determine whether our holding in *Juedeman* sufficiently provides an absolute defense as a matter of law in this instance.

¶70 In *Juedeman* we unequivocally stated that "[i]n substance, this Court has held that without an agreement to release, there is no offer for settlement." *Juedeman*, 253 Mont. at 281, 833 P.2d at 193. This succinct rule rested soundly on our decision in *Thompson*, where we stated that "there was never an agreement to release Thompson fully . . . . [t]hus, no offer or demand for settlement within policy limits was made." *Thompson*, 161 Mont. at 220, 505 P.2d at 430. In both instances, the third-party's bad faith claim based on the insurer's refusal to pay policy limits without a full and final release failed. Further, our decision in *Juedeman* was not subsequently addressed by this Court until 1997, when we decided *Ridley*.

¶71 We conclude that at the time this dispute arose, *Juedeman* was the lone precedent from Montana case law upon which Guaranty could rely under the circumstances. From early on in this dispute, counsel for Guaranty offered *Juedeman* as legal authority for its position. In contrast, counsel for the Watters, while insisting as early as December of 1993 that Guaranty was acting in bad faith pursuant to § 33-18-201(6), MCA, did not cite to one favorable Montana case that squarely addressed the issues here in its dialogue of negotiation with Guaranty.

¶72 We must therefore conclude that a plain reading of the available case law at the time gave Guaranty a reasonable basis in law upon which it could deny payment of policy limits. That is, *Juedeman* was legally conclusive to the extent there was simply no other authority in Montana at the time suggesting that in order to effectuate a prompt, fair, and equitable settlement of a third-party claim in good faith, an insurer must, under certain circumstances, pay policy limits without a full and final release for its insured. Unfortunately for the Watters, this was simply not the law in Montana at the time. Now, it is.

¶73 Accordingly, the District Court's order granting summary judgment in favor of the Watters is reversed, and the court is ordered to grant summary judgment in favor of Guaranty pursuant to its cross-motion for summary judgment. This case is remanded for further proceedings consistent with this opinion.

/S/ JAMES C. NELSON

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ TERRY N. TRIEWEILER

/S/ JIM REGNIER

/S/ TED L. MIZNER

District Judge, sitting for Justice W. William Leaphart

Justice Karla M. Gray, specially concurring.

¶74 I join in the Court's resolution of both issues in this case. With regard to its discussion of issue one, however, I cannot agree with the Court's decision that it is necessary to overrule any portion of *Juedeman* or *Thompson*.

¶75 The Court goes to great lengths throughout its opinion, and properly so, to observe that this case ust be resolved on its specific facts, including the material facts that this case involves the Unfair Trade Practices Act (UTPA), Montana's Motor Vehicle Safety-Responsibility Act and the mandatory minimum insurance coverages required thereunder. Neither *Thompson* nor *Juedeman* involved these facts. Indeed, *Thompson* does not discuss or apply any statutory requirements; that decision is based entirely on "bad faith" case law. *Juedeman*, on the other hand, involves the UTPA but not mandatory minimum insurance coverages under the Motor Vehicle Safety-Responsibility Act. Given these differences, it is possible to distinguish both *Juedeman* and *Thompson* on their facts and limit their holdings to the facts of those cases, and I would do so. Under such an approach, the *Juedeman* holding that there is no offer for settlement without an agreement to release would--and should--continue to apply to cases which do not involve the mandatory minimum coverages required under the Motor Vehicle Safety-Responsibility Act. Such an approach also would support the Court's conclusion--with which I agree--that § 33-18-201 (6), MCA, does not require a settlement to include a full and final release of all claims "under all circumstances."

¶76 Furthermore, the Court's decision to overrule *Juedeman* and *Thompson* does not meet our standard in determining whether to depart from the fundamental doctrine of *stare decisis* which "reflects our concerns for stability, predictability and equal treatment. . . ." *See Formicove, Inc. v. Burlington Northern, Inc.* (1983), 207 Mont. 189, 194, 673 P.2d 469, 472. While we are not required to follow a manifestly wrong decision (*Formicove*, 207 Mont. at 194, 673 P.2d at 472 (citations omitted)), the Court does not point to any portion of either *Juedeman* or *Thompson* which is wrong, much less manifestly wrong. I simply cannot join the Court in overruling cases for no reason.

¶77 Finally, I continue to disagree with the practice of overruling cases "to the extent" they are inconsistent with the opinion in a current case. In this regard, the Court purports to both "overrule and distinguish" *Juedeman* and *Thompson* "to the extent those decisions are inconsistent with this opinion." As set forth above, the cases are readily distinguishable from the present case and should simply be distinguished. The Court provides no guidance

for future cases by both overruling and distinguishing the earlier cases. Moreover, if there are portions of those cases which are actually inconsistent with something in the present case, the Court should clearly identify them and, if necessary, overrule those specific portions so that legal practitioners and trial courts are properly advised of the continuing viability or lack thereof of *Juedeman* and *Thompson*. In my view, the Court has taken the easy--but not the prudent--way out in its final discussion of those cases.

¶78 Aside from these concerns, I join in the Court's opinion.

/S/ KARLA M. GRAY

1. Our decision in *Ridley*, as both parties point out, was decided several years after Guaranty refused payment and the Watters brought this unfair trade practice action. Notwithstanding our decision in *Ridley*, Guaranty asserts that *Juedeman* is still good law on the issue of whether the refusal of policy limits without a full and final release is an act of bad faith.

2. Guaranty points out that the *Lazaris* court overruled *Thaler v. American Ins. Co.* (Mass.App.Ct. 1993), 614 N.E.2d 1021, a case the district court followed here in determining that Guaranty, as a matter of law, committed an unfair trade practice. Like *Ridley*, *Lazaris* was decided well after this litigation commenced. Unlike *Lazaris*, however, the facts in *Thaler* were identical to those here. The *Thaler* court concluded that "the insistence on a release by an insurer as a condition of payment of the policy limits where liability of its insured is undisputed and damages clearly exceed the policy limits amounts to an unfair settlement practice . . ." *Thaler*, 614 N.E.2d at 1023-24. The *Thaler* court, however, decided in favor of the insurer based on the insurer's reasonable reliance on the case law--or, rather, the lack of "applicable precedent"--at the time of its decision to refuse payment. *See Thaler*, 614 N.E.2d at 1024.

3. The Watters have, in fact, raised the issue that such a release is unconscionable. However, whether the release in this instance was, as a matter of law, unconscionable was not specifically raised or addressed by the parties, and is therefore not within the scope of our *de novo* review of this matter.