JUSTICE LEAPHART
delivered the Opinion of the Court.
¶1 Janet Redies (“Redies”) brought the instant action in the District Court for the Thirteenth Judicial District, Yellowstone County, against Attorneys Liability Protection Society, Inc., and four of its employees (collectively, “ALPS”). She alleged that ALPS had, two years earlier, engaged in unfair trade practices by failing to settle promptly the legal malpractice suit she had brought against John Kelly Addy (“Addy”), one of ALPS’s insureds. Redies further alleged tortious breaches of statutory duties and the implied duty of good faith and fair dealing.
¶2 ALPS answered Redies’ complaint and thereafter filed a motion for summary judgment, which the District Court granted. The court determined that ALPS had “a reasonable basis in law” under § 33-18- *235 242(5), MCA, for contesting Redies’ claims against Addy, that there were no genuine issues of material fact, and that ALPS was entitled to judgment as a matter of law. The court further determined that all other pending motions were moot. Redies timely appealed.
¶3 On appeal, Redies has framed a number of interrelated issues, all of which pertain to the following overarching question: Did the District Court err by granting ALPS’s motion for summary judgment on the ground that ALPS had a reasonable basis in law for contesting Redies’ claims against Addy?
¶4 In the course of answering this question, we address the following sub-issues raised by Redies: whether the reasonableness of ALPS’s “basis in law” for contesting Redies’ claims against Addy is a question of fact or a question of law; whether genuine issues of material fact remain, thus precluding summary judgment in this case; and, lastly, whether Redies’ “reasonable investigation” claim under § 33-18-201(4), MCA, survives a determination under § 33-18-242(5), MCA, that ALPS had a reasonable basis in law for contesting Redies’ claims against Addy.
FACTUAL AND PROCEDURAL BACKGROUND
I. The Conservatorship
¶5 Redies was involved in a bicycling accident on May 29,1995, as a result of which she suffered a traumatic brain injury and was comatose for approximately two weeks. Consequently, Redies’ mother, Rosalie Redies (“Rosalie”), and sister, Judy Uerling (“Uerling”), filed a petition in the District Court[1] for the appointment of a temporary conservator of Redies’ estate. The court granted the petition on June 8, 1995, appointing C. A. Cosner (“Cosner”), a certified public accountant with whom the family already had a relationship, to serve in this capacity.
¶6 Redies emerged from her coma in mid-June 1995; however, she remained somewhat disoriented and unaware of her surroundings. Given her persistent incapacity, Rosalie and Uerling petitioned the District Court to make Cosner’s appointment permanent. The court first appointed Vicki W. Dunaway (“Dunaway”), who had previously represented Redies in a number of matters, to represent Redies as “attorney ad litem” in conjunction with Rosalie and Uerling’s petition. Following an investigation, Dunaway reported that Redies’ mental condition, although somewhat improved, was still not to the level of *236 being able to handle either her financial affairs or arrangements concerning her person. Accordingly, on September 6, 1995, the court appointed Cosner as permanent conservator, a capacity in which he served through April 25,2000. (This conservatorship, incidentally, was the subject of a previous appeal to this Court. See Redies v. Cosner, 2002 MT 86, 309 Mont. 315, 48 P.3d 697.)
¶7 After his appointment as temporary conservator, Cosner learned that Redies owned significant assets, most of which were heavily encumbered; that she did not have any health insurance; and that she was incurring substantial medical costs due to her injuries. In June 1995, he applied for Medicaid benefits on Redies’ behalf; however, the extent of her assets apparently disqualified her from receiving such benefits.
¶8 Cosner became concerned that Redies’ mounting medical bills would quickly exceed all equity in her assets. Thus, immediately following his appointment as permanent conservator, he met with Uerling, Dunaway, and Addy to discuss Redies’ financial situation and how best to conserve and manage her estate. Addy-who, as noted above, was an ALPS-insured attorney-was already involved in the case, having been retained by Cosner for legal advice concerning the management and administration of Redies’ estate. Addy also had represented Uerling in an earlier dispute with Redies, which was fully resolved the previous year. See Redies, ¶ 5.
¶9 Cosner, Uerling, Dunaway, and Addy discussed a number of assets in Redies’ estate and agreed that a management plan should be developed to maximize the amount of Redies’ wealth that would be exempt from recapture by the government or the claims of creditors. Of particular relevance, Addy suggested that Cosner “pauperize” (in other words, impoverish) Redies by selling off most of her assets so that she could qualify for and receive Medicaid payments for her supervised care. For instance, it was decided that Redies’ twenty-acre parcel of land south of Red Lodge should be liquidated; that Cosner should dispose of Redies’ five vehicles; and that Uerling should go into Redies’ home and take anything Uerling thought she could use or that had significant sentimental value to her, particularly a knife set given to Redies by her father.[2] The possibility of filing a bankruptcy petition was also addressed, and Addy recommended that Rosalie’s will be *237 revised so that any bequest or devise to Redies would lapse in the event that she was still incapacitated at the time of Rosalie’s death. That way, the bequest or devise would not end up going to creditors or the government under the recapture provisions of the Medicaid program.
¶10 Cosner proceeded to manage Redies’ property according to the recommendations and decisions made at the September 6, 1995 meeting, selling real and personal property owned by Redies, putting the remaining personal property in storage, paying a number of Redies’ debts, and seeking settlement with her remaining creditors. He successfully avoided bankruptcy and was able to negotiate forgiveness of approximately $123,000 in medical bills, after which Uerling (who had been appointed Redies’ guardian at the same time Cosner was appointed Redies’ conservator) qualified Redies for Medicaid and Social Security Supplemental Security Income (“SSI”) coverage. Uerling also arranged medical care for Redies.
¶11 By 1998, Redies had made a significant recovery, and she began to question the disposition of her assets, as she was subsisting on SSI payments. Through new counsel, she sought an accounting of her assets and details regarding the management of her estate. Cosner and Uerling attempted to answer Redies’ questions; however, each answer gave rise to new questions. The tone of the correspondence became adversarial, and Cosner and Uerling eventually filed petitions to terminate their respective roles as conservator and guardian. See Redies, ¶¶ 8-10. Litigation ensued, which ultimately culminated in Redies’ previous appeal to this Court (which we decided May 2, 2002).
II. Redies v. Addy
¶12 Meanwhile, on or about July 9, 2001, Donald L. Harris (“Harris”), Redies’ counsel at the time, notified Addy and Cosner of a complaint he was prepared to file on Redies’ behalf. Among other things, Harris identified claims for negligence due to Addy and Cosner’s failure, promptly after Redies’ bicycling accident, to establish a trust to protect and preserve her estate. He also indicated that Redies preferred “to resolve this matter without filing a lawsuit if that is possible.”
¶13 As it turns out, the parties were unable to negotiate a resolution, and Redies ended up filing a complaint in January 2002. The course of events during the period beginning in July 2001 and ending in December 2002-in particular, ALPS’s refusal to settle Redies’ claims against Addy both before and after she filed her complaint-formed the basis of her present unfair trade practices action against ALPS. Thus, it is necessary to set forth, in some detail, a number of the parties’ communications and court filings during this period. Because *238 negotiations over Redies’ negligence claim against Cosner are not relevant to the issues before us (notably, he was not named in the complaint she ultimately filed), the ensuing discussion focuses solely on the exchanges pertaining to Redies’ claims against Addy.
¶14 On receipt of Harris’s letter, Addy immediately notified ALPS, which undertook an investigation into the merits of Redies’ claims. The record discloses a number of communications between ALPS and Addy and between ALPS and Harris, as well as research on Harris’s part, during the latter half of 2001. In October, Harris obtained a professional opinion on whether a self-sufficiency trust (see §§ 53-18-101 to -105, MCA, and Admin. R. M. 37.2.501 to .513) could and should have been established following Redies’ bicycling accident to conserve her assets. He was advised that, given Redies’ disabling brain injury, her substantial medical bills, and her lack of health insurance, the establishment of a self-sufficiency trust would have qualified her for Medicaid while preserving her assets in a trust. He was further advised that income from the trust could have been used to supplement any needs not met by Medicaid or SSI (e.g., spending money, additional food and clothing, health services not otherwise covered, recreational needs).
¶15 Harris enclosed a copy of this report with a settlement demand to ALPS dated October 10, 2001. At the outset of his demand letter, he reiterated that “Ms. Redies hopes to settle her claims against Mr. Addy . . . without litigation.” He then articulated the theory behind those claims: Under the circumstances that existed immediately following Redies’ bicycling accident, Addy should have promptly recommended the establishment of a self-sufficiency trust for Redies. “Lawyers, in particular, are obligated to know about the laws which are relevant to their client’s case. ... To diligently represent Ms. Redies, . . . [Addy] had a duty to do sufficient research to learn about the Montana Self Sufficiency Trust statutes.” As a result of Addy’s failure to do so, “Redies’ estate was quickly depleted” and “[s]he now lives in poverty.”
¶16 After receiving Harris’s settlement demand, ALPS commissioned its own professional evaluation of Redies’ claims. Among other things, the authors of the December 4, 2001 evaluation provided to ALPS discussed a possible statute of limitations defense and questioned whether Redies could have qualified as a beneficiary under the self-sufficiency trust provisions. They also questioned whether Redies could even bring this action against Addy, and they disputed the damages figures recited in the settlement demand. Ultimately, they concluded that “sufficient questions exist as to the issue of liability so that we believe it is not reasonably clear. At this point, unless the Plaintiff is *239 willing [to] agree to a resolution of the case for an amount far below what their current demand is, we believe that a settlement conference would be of little value.”
¶17 Of particular significance in the case at hand is the analysis of whether Redies could even bring the action against Addy. While positing, initially, that “absent a direct attorney-client relationship between [Redies] and [Addy], no action should be allowed,” the authors of the evaluation went on to caution as follows:
As you know, however, there have been challenges in the past as to this privity requirement. Most of the erosion of the concept has occurred in connection with beneficiaries of wills being allowed to sue the attorney for the testator. To our knowledge, Montana has not decided the issue of whether a protected person might be able to sue the attorney of the conservator. Clearly, she could sue the conservator. Presumably, the conservator would have a right over against his attorney. Thus, our court may short circuit that process by simply finding that the relationship between the protected person and the conservator’s attorney was close enough to allow suit.
Given these considerations, they concluded as follows:
We do not put a great deal of stock in this privity defense, but it represents yet another problem the Plaintiff is going to experience in prosecuting her claim. Given sufficient time and effort, we believe that defense can be circumvented.
¶18 Within a week of receiving the foregoing report, ALPS notified Harris that it believed the case was defensible for the reasons stated in the December 4, 2001 evaluation and that it was rejecting Redies’ settlement offer. Accordingly, Redies filed a complaint on January 2, 2002, stating negligence and breach of fiduciary duty claims against Addy.
¶19 Addy (represented by ALPS) answered the complaint and, on or about March 18, 2002, filed a motion for summary judgment. In his motion, Addy maintained that proof that an attorney-client relationship existed is “[e]ssential to a malpractice action”; that his only attorney-client relationships in this matter were with Cosner and Uerling; and that “no attorney-client relationship exists or ever has existed between Plaintiff Redies and Defendant Addy.” Acknowledging that “[s]ome courts, in very limited situations, have extended the duty of an attorney to certain non-clients,” he noted that this Court suggested this possibility in Rhode v. Adams, 1998 MT 73, 288 Mont. 278, 957 P.2d 1124. He then argued that if this Court were confronted with the question of whether an attorney owes a duty to a nonclient, *240 we would adopt the multi-factor balancing test set forth in Trask v. Butler, 872 P.2d 1080, 1083 (Wash. 1994), and conclude that an attorney retained by a conservator has no duty to the protected person. (We acknowledged the Trask balancing test in Rhode but found it inapplicable to the factual scenario before us. See Rhode, ¶ 17.)
¶20 On May 23, 2002, the District Court, Judge Baugh presiding, denied Addy’s motion on the ground that factual and legal issues regarding the existence of an attorney-client relationship between Addy and Redies existed. It is not clear what negotiations between the parties, if any, immediately followed, but on or about October 11, 2002, Redies filed a motion for pretrial ruling asking the court to find, as a matter of law, that Addy owed her a duty of care when he rendered legal advice to Cosner concerning the management of her estate. Judge Baugh granted this motion on November 21, 2002, reasoning that “application of the Trask factors to the present case shows that Mr. Addy owed a duty to Ms. Redies when he rendered legal advice to the conservator, Mr. Cosner.” In addition, the court determined that Redies was an “intended beneficiary” of Addy’s advice to Cosner in light of § 72-5-427(3)(w), MCA.[3] Shortly thereafter, the parties settled the suit.
III. Redies v. ALPS
¶21 On December 9, 2003, Redies filed the instant action alleging, pursuant to § 33-18-242(1), MCA, that ALPS had violated § 33-18-201, MCA, during the foregoing negotiations in Redies v. Addy. Specifically, with respect to the period (in 2001) before she filed her complaint, she alleged that Addy’s liability to Redies “was reasonably clear”; that she had “made a good faith, prompt attempt to settle the claim”; and that ALPS, “without statement of any meritorious basis in fact or in law, denied the claim and refused to offer any amount to settle the claim,” instead “embark[ing] upon a course and pattern of delay in the investigation, evaluation, and settlement of the claim, all of which was in bad faith.”
¶22 Redies further alleged that after she filed her complaint in January 2002, ALPS “continued their pattern and course of delay and *241 purposeful frustration of Plaintiffs rights,” though “the liability of [Addy] was reasonably clear, and such liability was known to [ALPS] or would have been known upon reasonable investigation of all information available.” In addition to her unfair trade practices claim, Redies alleged, in two separate counts, tortious breaches of statutory duties (specifically, § 33-18-201, MCA) and the implied duty of good faith and fair dealing.
¶23 ALPS answered Redies’ complaint and, on October 25,2004, filed a motion for summary judgment on the ground that “[a]t all times during the pendency of the underlying case against [Addy] ..., ALPS had a ‘reasonable basis in law’ for contesting Redies’s claim”-namely, “that as the attorney for a conservator, [Addy] did not owe a professional duty of care to Redies, the protected person in a conservatorship proceeding.” Taking advantage of language in Watkins Trust v. Lacosta, 2004 MT 144, 321 Mont. 432, 92 P.3d 620, which we had decided in the interim (on June 8, 2004), ALPS asserted that the defense it had maintained on Addy’s behalf in the underlying action was “rock solid (and ALPS was entitled to rely upon it) because Montana law did not recognize a professional duty running from the lawyer for a conservator to a non-client beneficiary such as Redies.” (As discussed below, we noted in Watkins Trust that “[t]he duty owed [by an attorney] to a nonclient beneficiary is a matter of first impression in Montana.” Watkins Trust, ¶ 21 (citing Rhode, ¶¶ 12-13).)
¶24 The District Court, Judge Todd presiding, agreed with ALPS, reasoning that “not until 2004, when the Montana Supreme Court issued its opinion, in a case of first impression, were Montana attorneys held to owe duties to non-client beneficiaries.” The court acknowledged our statement in Rhode that “a multi-factor balancing test, such as that set out in Trask, may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice.” Rhode, ¶ 17 (emphasis added). However, the court decided that the Trask test was not applicable to the case at hand because “an adversarial situation” existed between Redies and Uerling, which precluded the imposition of a fiduciary duty running from Addy to Redies during the months immediately following Redies’ accident (citing Rhode, ¶ 17).[4]
*242 ¶25 Having determined that at the time of the alleged malpractice, Addy did not owe a duty to third-party beneficiaries such as Redies, the court concluded that “ALPS had a reasonable basis in law for the denial of and defense against Redies’ claim” and that no genuine issues of material fact remained. Accordingly, the court granted ALPS’s motion. Notably, Judge Todd did not rule on a M. R. Civ. P. 56(f) motion filed by Redies on November 30, 2004, except to say that “[t]his order renders all other motions in the cause of action moot.”
STANDARD OF REVIEW
¶26 We review a district court’s ruling on a motion for summary judgment de novo, applying the same criteria of M. R. Civ. P. 56 as did the district court. Cole v. Valley Ice Garden, L.L.C., 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4. Rule 56(c) provides that a motion for summary judgment “shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.” Because summary judgment is an extreme remedy which should not be a substitute for a trial on the merits if a controversy exists over a material fact, “the evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn therefrom in favor of the party opposing summary judgment.” Prindel v. Ravalli County, 2006 MT 62, ¶ 19, 331 Mont. 338, ¶ 19, 133 P.3d 165, ¶ 19 (internal quotation marks omitted); In re Dorothy W. Stevens Revocable Trust, 2005 MT 106, ¶ 13, 327 Mont. 39, ¶ 13, 112 P.3d 972, ¶ 13; see also Hi-Tech Motors v. Bombardier Motor Corp., 2005 MT 187, ¶ 32, 328 Mont. 66, ¶ 32, 117 P.3d 159, ¶ 32 (explaining the process by which a motion for summary judgment is evaluated).
DISCUSSION
I. The Reasonable Basis in Law Defense
¶27 As noted above, Redies brought the instant action under the statutory provisions which prohibit unfair trade practices by insurance companies. Specifically, § 33-18-242(1), MCA, creates an independent *243 cause of action by an insured or a third-party claimant against an insurer “for actual damages caused by the insurer’s violation of subsection (1), (4), (5), (6), (9), or (13) of 33-18-201.” Redies’ complaint does not specify any particular subsections of § 33-18-201, MCA; however, on appeal she and ALPS confine their respective arguments to subsections (4) and (6), which provide as follows:
No person may ... do any of the following: ... (4) refuse to pay claims without conducting a reasonable investigation based upon all available information;... (6) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear;....
Section 33-18-201(4), (6), MCA (paragraph breaks omitted).
¶28 An insurer, however, is not liable under § 33-18-242, MCA, if it had “a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue.” Section 33-18-242(5), MCA. An insurer asserting this affirmative defense has the burden of establishing it by a preponderance of the evidence. Watters v. Guaranty Nat. Ins. Co., 2000 MT 150, ¶¶ 65, 67, 300 Mont. 91, ¶¶ 65, 67, 3 P.3d 626, ¶¶ 65, 67, overruled in part on other grounds, Shilhanek v. D-2 Trucking, Inc., 2003 MT 122, ¶ 21, 315 Mont. 519, ¶ 21, 70 P.3d 721, ¶ 21. ALPS invoked the reasonable basis “in law” portion of § 33-18-242(5), MCA, as a defense to Redies’ claims against it.
¶29 To determine whether an insurer had “a reasonable basis in law ... for contesting the claim or the amount of the claim,” it is necessary first to survey the legal landscape as it existed during the relevant time period. See Shilhanek, ¶¶ 24-31. Thus, we must step into ALPS’s shoes during the communications and negotiations which took place from July 2001 (when Redies, through Harris, first presented Addy with her claims against him) through December 2002 (when the parties finally settled those claims). We then determine, from this perspective, whether the defense proffered by ALPS-namely, that an attorney retained by a conservator does not owe a duty to the protected person-was, at that time, “a reasonable basis in law” for contesting Redies’ claims. Before doing so, however, it is necessary first to address the parties’ dispute over whether this issue presents a question of fact or a question of law.
II. Question of Fact or Question of Law
¶30 In Dees v. American Nat. Fire Ins. Co., 260 Mont. 431, 861 P.2d 141 (1993), then-Justice Gray expressed the view that
[b]ecause reasonableness is a question of fact, it is for the trier of fact to weigh the evidence and judge the credibility of the *244 witnesses in determining whether the insurer had a “reasonable basis” for denying a claim. Thus, such determinations generally must be based on the facts and circumstances of each case.
Dees, 260 Mont. at 452, 861 P.2d at 154 (Gray, J., joined by Turnage, C.J., and Nelson, J., specially concurring). We later adopted this proposition in Dean v. Austin Mut. Ins. Co., 263 Mont. 386, 869 P.2d 256 (1994), where we stated as follows:
[Reasonableness is generally a question of fact; therefore, it is for the trier of fact to weigh the evidence and judge the credibility of the witnesses in determining whether the insurer had a “reasonable basis” for denying a claim. This is not a determination that can be made “as a matter of law,” as requested by the Deans and by Austin Mutual. Rather, whether an insurer has a reasonable basis in law or in fact for contesting a claim or the amount of a claim is to be determined as any other disputed issue of fact based upon the evidence and circumstances of each case.
Dean, 263 Mont. at 389, 869 P.2d at 258 (citing the special concurrence in Dees), accord DeBruycker v. Guaranty Nat. Ins. Co., 266 Mont. 294, 298, 880 P.2d 819, 821 (1994).
¶31 The following year, however, in Watts v. Westland Farm Mut. Ins. Co., 271 Mont. 256, 895 P.2d 626 (1995), we determined that Dean’s trier-of-fact rule did not apply when there was no insurance policy in effect at the time the injury occurred. See Watts, 271 Mont. at 263, 895 P.2d at 630 (“[T]here can be no genuine issues of material fact concerning [the insurers’] obligations for damage to the cantaloupe crop” given that “the binder that temporarily insured the cantaloupe was not in effect at the time of the July 18, 1993 hailstorm.”). This same exception controlled our disposition of an unfair trade practices claim in Bartlett v. Allstate Ins. Co., 280 Mont. 63, 70, 929 P.2d 227, 231 (1996) (“Bartlett did not have an insurable interest in the property and, on that basis, Allstate clearly had a reasonable basis for not paying Bartlett’s claim for insurance proceeds.”).
¶32 We later acknowledged a second exception to the trier-of-fact rule. In Watters, we reasoned that the rule “is not necessary in a summary judgment proceeding where the underlying “basis in law’ [for contesting the claim or the amount of the claim] is grounded on a legal conclusion, and no issues of fact remain in dispute.” Watters, ¶ 69 (emphasis added). Thus, we determined in Watters that it was for the court, not the trier of fact, to determine whether the applicable legal precedent provided an absolute defense as a matter of law. Watters, ¶ 69.
¶33 In the case at hand, Redies maintains that neither of the two *245 exceptions to the trier-of-fact rule applies in this case and, therefore, that the reasonableness of ALPS’s decision to contest her claims against Addy is a question of fact, thus precluding summary judgment. There is no dispute that Addy, in fact, was insured by ALPS at the time of the alleged malpractice; thus, Redies focuses on the second exception to the rule. Seizing on language in Watters — specifically, our observation that the case law on which the insurer had relied was “legally conclusive” as to the disposition of the Watters’ claim against its insured, Watters, ¶ 72-she argues that unless there was “legally conclusive” law establishing that the insurer had no obligation to pay the claim, the “reasonable basis in law” issue must go to the trier of fact. And since there was no “legally conclusive” law in Montana establishing that a lawyer retained by a conservator does not owe a duty to the protected person, she concludes that the reasonableness of ALPS’s decision to contest her claims on this ground is a factual issue for a jury to decide.
¶34 Redies’ narrow interpretation of the second exception to the trier-of-fact rule is incorrect. Tobe sure, we noted in Watters that Juedeman v. National Farmers Union, 253 Mont. 278, 833 P.2d 191 (1992), as “the lone precedent from Montana case law upon which [the insurer] could rely under the circumstances,” was “legally conclusive to the extent there was simply no other authority in Montana at the time.” Watters, ¶¶ 71, 72. This was not to say, however, that whenever the insurer’s decision to contest a claim is not sustained by “legally conclusive” law, the issue of reasonableness must go to the trier of fact. Rather, our reasoning centered on the fact that the insurer’s basis in law for contesting the claim was “grounded on a legal conclusion.” See Watters, ¶ 69.
¶35 Accordingly, we now clarify that while the assessment of reasonableness generally is within the province of the jury (or the court acting as fact-finder), Dean, 263 Mont. at 389, 869 P.2d at 258, reasonableness is a question of law for the court to determine when it depends entirely on interpreting relevant legal precedents and evaluating the insurer’s proffered defense under those precedents. This distinction not only reflects the principle that the jury does not decide or determine the law, see § 25-7-102, MCA, but also honors the relevant language of the statute at issue, see § 33-18-242(5), MCA (“An insurer may not be held liable under this section if the insurer had a reasonable basis in law ... for contesting the claim or the amount of the claim.” (emphasis added)).
III. The Legal Landscape
¶36 Turning now to the relevant legal landscape, we must, as *246 explained above, determine whether the defense proffered by ALPS on Addy’s behalf-namely, that an attorney retained by a conservator does not owe a duty to the protected person-was “a reasonable basis in law” for contesting Redies’ claims in 2001 and 2002.
A. First-Party Relationship between Addy and Redies
¶37 Redies argues briefly that Addy acted not only as attorney for Cosner, but also as attorney for Redies. In essence, she suggests that Addy held himself out as her attorney and, thus, that there was an attorney-client relationship between them. Similarly, Justice Cotter’s Dissent articulates a credible argument that an attorney-client relationship exists between a protected person and the attorney retained by the protected person’s conservator to render legal advice concerning the administration of the estate. Although the Dissent does not use the term, it apparently is of the view that the protected person and the attorney are in “privity of contract.”[5] From this, the Dissent maintains that “Redies was Addy’s client.”
¶38 Redies’ and the Dissent’s arguments, however, overlook the issue at hand, which is whether ALPS had a reasonable basis in law for contesting Redies’ claims. To answer this question, we must survey the legal landscape as it actually existed during the parties’ negotiations. In this regard, neither Redies nor Justice Cotter’s Dissent cites any Montana authority establishing, or even intimating, that an attorney retained by a conservator represents the protected person. Had such authority existed at the time ALPS contested Redies’ claims, this would be a different case. As it is, however, Redies and the Dissent seem to be faulting ALPS for contesting a theory of liability-namely, that Redies was Addy’s client-whieh Redies and the Dissent believe is compelling but which, nevertheless, was an open question in Montana in 2001 and 2002. (Incidentally, Redies raised this same theory in the District Court, but her primary argument was that an attorney owes a duty of care to certain third parties such as herself.) Such an approach misplaces the focus of our inquiry, which is not on whether we agree with the plaintiffs theories of liability in the underlying suit but, rather, whether the insurer’s grounds for contesting those theories were reasonable under the existing law.
B. Third-Party Relationship between Addy and Redies
¶39 In addressing the issue of whether its defense in the underlying *247 suit was “a reasonable basis in law” for contesting Redies’ claims, ALPS relies heavily on language in Watkins Trust v. Lacosta, 2004 MT 144, 321 Mont. 432, 92 P.3d 620. Specifically, ALPS points out that in Watkins Trust, we noted that “[t]he duty owed [by an attorney] to a nonclient beneficiary is a matter of first impression in Montana.” Watkins Trust, ¶ 21 (emphasis added) (citing Rhode v. Adams, 1998 MT 73, ¶¶ 12-13, 288 Mont. 278, ¶¶ 12-13, 957 P.2d 1124, ¶¶ 12-13). According to ALPS, based on this language, “the scope of Add/s legal duty was undecided ... until Watkins Trust was decided on June 8, 2004”; thus, contesting Redies’ claims on the ground that Addy owed no legal duty to Redies “was reasonable as a matter of law.”
¶40 Yet, when ALPS was investigating and negotiating Redies’ claims in 2001 and 2002, the foregoing “first impression” language of Watkins Trust did not yet exist. The reasonableness of ALPS’s decision to contest Redies’ claims on the ground that Addy owed her no duty must be evaluated within the context of our then-existing precedents, not something we said in a later decision. See Graf v. Continental Western Ins. Co., 2004 MT 105, ¶ 17, 321 Mont. 65, ¶ 17, 89 P.3d 22, ¶ 17 (“The [Unfair Trade Practices Act] standards focus on what the insurer knows at a particular point in time-before trial, during the investigative settlement stage.”).
¶41 Likewise, just because the scope of Addy’s duty may have been “undecided” in 2001 and 2002, it does not necessarily follow that ALPS’s decision to contest Redies’ claims against Addy was reasonable. It seems that in ALPS’s view, a legal theory for contesting a claim is reasonable per se so long as this Court has not yet explicitly rejected it-even if the theory has been called into serious question by then-existing precedents. We reject this interpretation of the statutory scheme, which turns reasonableness on its head and runs contrary to the public policy of Montana to encourage settlement and avoid unnecessary litigation, see Watters, ¶ 57. To be sure, a tort defendant and his or her insurer should, as ALPS submits, be able to test the scope and boundaries of legal duties, remedies, and defenses; but, at the same time, an insurer should not be immune from liability under § 33-18-242(1), MCA, as Redies points out, simply because this Court had not yet explicitly rejected the legal proposition on which the insurer relied in the underlying action. This is precisely the point of evaluating the “reasonableness” of the insurer’s proffered defense. Cf. Graf, ¶¶ 16-18 (rejecting the proposition that a defense verdict in the underlying action provides, as a matter of law, a reasonable basis defense to a subsequent Unfair Trade Practices Act (“UTPA”) claim, since such a rule would promote the claim settlement abuses the *248 UTPA was designed to deter-e.g., by encouraging insurers to obtain defense verdicts in the underlying suit at any cost).
¶42 In this regard, although Watkins Trust was the first instance in which we explicitly held that an attorney owed a duty to a nonclient third party-specifically, we held that a drafting attorney owes a duty to nonclient beneficiaries named in the drafted instrument, see Watkins Trust, ¶¶ 21-22-our decision was not the watershed event suggested by ALPS and the District Court. Rather, our holding was an extension of existing precedents. Indeed, we observed that
a finding of duty is consistent with existing Montana law. This Court has noted that a multi-factor balancing test adopted in other jurisdictions may be appropriate in deciding the duty owed by attorneys to nonclients in estate planning. Rhode, ¶ 17. Additionally, we have recognized liability to nonclients in other professional contexts. See, e.g., Thayer v. Hicks (1990), 243 Mont. 138, 793 P.2d 784 (accounting firm liable to nonclient); Jim’s Excavating Serv. v. HKM Assoc. (1994), 265 Mont. 494, 878 P.2d 248 (professional engineer liable to nonclient); Turner v. Kerin & Assoc. (1997), 283 Mont. 117, 938 P.2d 1368 (professional engineer liable to nonclient).
Watkins Trust, ¶ 22 (emphasis added).
¶43 Accordingly, the determinative question is whether this progression in our case law toward holding an attorney liable to certain nonclients had, by the time Redies stated her claims against Addy, reached the point at which ALPS’s assertion that he owed her no duty no longer constituted “a reasonable basis in law” for contesting her claim.
¶44 The starting point for answering this question is Rhode, in which we signaled that an attorney may owe a duty to nonclients in some contexts. Specifically, after noting that we had not before discussed “whether an attorney owes a duty to third persons to exercise care in the performance of services for his or her client,” Rhode, ¶ 12, we went on to state that such a duty may arise in some contexts, but not where the attorney is representing a client in adversarial proceedings (as was the case in Rhode), Rhode, ¶ 17. We further indicated that “a multi-factor balancing test, such as that set out in [Trask v. Butler, 872 P.2d 1080, 1083 (Wash. 1994)], may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice.” Rhode, ¶ 17. Thus, as of our decision in Rhode in 1998, it was clear that an attorney may owe a duty to nonclients in some nonadversarial contexts and that the Trask multi-factor *249 balancing test may be effective for ascertaining the existence of such a duty.
¶45 Redies suggests that the question of whether an attorney owes a duty to nonclients was not as unsettled as the foregoing language in Rhode implies. She argues that “[l]ong before any claim was asserted against Mr. Addy, this Court had effectively discarded the outdated ‘privity of contract’ concept.” In support of this proposition, she directs our attention to the three other cases identified in ¶ 22 of Watkins Trust-namely, Thayer, Jim’s Excavating, and Turner — in which we recognized the existence of a duty to nonclients in a number of professional contexts.
¶46 In Thayer, we addressed the extent to which an accountant owes a duty of care to third parties with whom he is not in privity. After discussing three different approaches by which courts determine the extent of an accountant’s duty of care to nonclients, Thayer, 243 Mont. at 144-46, 793 P.2d at 788-89, we held that “an accountant may owe a duty of care to third parties with whom he is not in privity of contract,” but “this duty exists only if the accountant actually knows that a specific third party intends to rely upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product,” Thayer, 243 Mont. at 149, 793 P.2d at 791.
¶47 Next, in Jim’s Excavating, we addressed whether an engineering firm could be held liable to a contractor with whom it was not in contractual privity. HKM, the engineering firm, argued that an engineer only has a duty to the party with whom it has contracted. Jim’s Excavating, 265 Mont. at 502, 878 P.2d at 252. We rejected this contention, noting that HKM’s argument “ignores the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort.” Jim’s Excavating, 265 Mont. at 502, 878 P.2d at 253 (citing Hawthorne v. Kober Const. Co., Inc., 196 Mont. 519, 640 P.2d 467 (1982), and Tynes v. Bankers Life Co., 224 Mont. 350, 730 P.2d 1115 (1986)). We went on to hold that “a third party contractor may successfully recover for purely economic loss against a project engineer or architect when the design professional knew or should have foreseen that the particular plaintiff or an identifiable class of plaintiffs were at risk in relying on the information supplied.” Jim’s Excavating, 265 Mont. at 506, 878 P.2d at 255.
¶48 Finally, in Turner, we considered whether one who succeeds to a mortgagee’s security interest in real property could state a cause of action against a third party for damages to that property which impair his or her security interest. Based on a passage from Prosser, The Law *250 of Torts § 93 (4th ed., West 1971), which we had also relied on in Jim’s Excavating, we reasoned that “by contracting with the owners to perform engineering work on the property, Kerin placed itself in a relation toward any party who held a security interest in the property that the law imposed upon him an obligation, sounding in tort and not in contract, to act in such a way that the security interest would not be injured.” Turner, 283 Mont. at 126, 938 P.2d at 1374. Accordingly, we held that “a person who, subsequent to the damage to the property, acquires a pre-existing security interest in the property can maintain a cause of action for impairment of that security interest to the extent of the outstanding debt.” Turner, 283 Mont. at 127, 938 P.2d at 1374.
¶49 Relying on these cases, Redies asserts that this Court “abolished the old ‘privity of contract’ requirement that formed the basis of ALPS’ ‘no privity’ defense.” Similarly, Justice Nelson’s Dissent points out that this Court called the privity concept into doubt twenty years before ALPS relied on this defense to Redies’ claims against Addy. Specifically, we stated in Hawthorne that “[w]e view privity to be a concept having proper application in the area of contract law. There seems to be no sound public policy argument for extending its application to tort.” Hawthorne, 196 Mont. at 523, 640 P.2d at 469.
¶50 We agree with both Redies and Justice Nelson’s Dissent that Hawthorne, Tynes, Thayer, Jim’s Excavating, Turner, and Rhode reflected the demise of the “privity of contract” requirement historically imposed upon a plaintiff seeking to hold a defendant liable for professional malpractice. Indeed, we indicated in Jim’s Excavating that this requirement had been “abolish[ed].” See Jim’s Excavating, 265 Mont. at 502, 878 P.2d at 253 (referring to “the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort”). However, none of these cases abolished the requirement that a plaintiff in a professional malpractice action first prove that the defendant owed her a duty of care, as Justice Nelson’s Dissent ably demonstrates with respect to attorneys. See ¶¶ 86-87 (citing Carlson v. Morton, 229 Mont. 234, 238, 745 P.2d 1133, 1136 (1987); Lorash v. Epstein, 236 Mont. 21, 24, 767 P.2d 1335, 1337 (1989); Merzlak v. Purcell, 252 Mont. 527, 529, 830 P.2d 1278, 1279 (1992); and Hauschulz v. Michael Law Firm, 2001 MT 160, ¶ 11, 306 Mont. 102, ¶ 11, 30 P.3d 357, ¶ 11). In other words, the mere absence of a privity requirement does not render a professional liable for the negligent performance of a contract to any and all third parties. To the contrary, in recognizing tort liability in the absence of privity, we have concomitantly limited the class of plaintiffs to identifiable third parties (typically, those who are known or are reasonably foreseeable by the *251 professional, see Thayer, 243 Mont. at 149, 793 P.2d at 791; Jim’s Excavating, 265 Mont. at 506, 878 P.2d at 255).
¶51 In this regard, Justice Nelson’s Dissent points out that by 2001, at least three different approaches existed in our case law for ascertaining the duty of care owed by a professional to third parties-namely, the rule enunciated by Prosser and applied by this Court in Hawthorne, Tynes, Jim’s Excavating, and Turner-, the approach we took in Thayer-, and the Trask multi-factor balancing test set forth in Rhode. See ¶¶ 89-92. Yet, we had not adopted any of these approaches with respect to attorneys specifically. Moreover, we signaled in Rhode that the Trask test, in particular, may be effective for this purpose. Rhode, ¶ 17.
¶52 Thus, the circumstances and extent of any duty owed by an attorney to a nonclient was not nearly as well-defined as Redies and Justice Nelson’s Dissent suggest it was during the period in which ALPS contested Redies’ claims against Addy. We acknowledged in Rhode that we had never before addressed whether an attorney, specifically, owes a duty to third persons to exercise care in the performance of services for his or her client. Rhode, ¶ 12. And we left this issue unresolved with respect to nonadversarial situations, stating merely that “a multi-factor balancing test, such as that set out in Trask, may be effective when used to address the duties of attorneys in transactional matters or estate planning and probate practice.” Rhode, ¶ 17 (emphasis added). Given this equivocal language, the question of whether an attorney retained by a conservator owed a duty to the protected person was unsettled in 2001 and 2002. Notably, Redies concedes as much by pointing out that until Watkins Trust, there was no “legally conclusive” law in Montana establishing that a lawyer retained by a conservator does or does not have a duty to the protected person. We therefore reject the contention that the law in Montana was decidedly against ALPS’s position.
IV. Application
¶53 As explained above, it was clear as of our decision in Rhode that an attorney may owe a duty to nonclients in some nonadversarial contexts and that the Trask multi-factor balancing test may be effective for ascertaining the existence of such a duty. Not surprisingly, therefore, Addy (represented by ALPS) addressed the Trask test at length in his motion for summary judgment in Redies v. Addy. After pointing out that a plaintiff in a legal malpractice action “must establish that the professional owed him a duty of care,” he acknowledged that “[s]ome courts ... have extended the duty of an attorney to certain non-clients.” He then asserted that “[a]lthough the *252 Supreme Court has not unequivocally adopted the multi-factor balancing test, it is clear that even if it was applied, there would be no liability to Janet Redies under these circumstances.”
¶54 In Rhode, we listed the six factors which comprise the Trask balancing test: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant’s conduct and the injury; (5) the policy of preventing future harm; and (6) the extent to which the profession would be unduly burdened by a finding of liability. See Rhode, ¶ 14. Applying these factors, Addy argued that Redies was an “incidental beneficiary” of his attorney-client relationship with Cosner; that he “had no authority to act on his own with regard to [Redies’ estate]” and, thus, Redies’ action should be directed against Cosner, the conservator, who was “[t]he only person with that legal authority”; and that public policy considerations counseled against finding a duty in this case because “[t]o hold Mr. Addy had duties to Janet Redies in addition to those of Mr. Cosner would create an irresolvable conflict of interest and division of loyalties for him.”
¶55 Given our decision in Watkins Trust, the foregoing argument is now of dubious merit. However, we cannot say that it was unreasonable at the time it was made. Given that we had signaled in Rhode that the Trask multi-factor balancing test may be effective for ascertaining the existence and scope of the duty owed by an attorney to nonclients in nonadversarial contexts, it was reasonable for ALPS to apply this test to the factual scenario at hand. Accordingly, we conclude that ALPS had “a reasonable basis in law” under § 33-18-242(5), MCA, for contesting Redies’ claims against Addy.
¶56 Redies points out that the authors of the December 4, 2001 evaluation commissioned by ALPS “discounted” the privity defense before ALPS denied Redies’ claims and “accurately predicted” that this defense would not prevail. Thus, she argues, it was unreasonable for ALPS to contest her claims against Addy on the ground that he owed her no duty.
¶57 The legal advice which informed ALPS’s decision to contest Redies’ claim is relevant to whether that decision was grounded in “a reasonable basis in law.” Had ALPS received advice that Addy owed Redies a duty under the existing law, this would be a different case. As it is, however, the evaluation authors’ ultimate assessment was that “sufficient questions exist as to the issue of liability so that we believe it is not reasonably clear.” And on the privity issue in particular, they stated that “absent a direct attorney-client relationship between *253 [Redies] and [Addy], no action should be allowed.” Their acknowledgement that “there have been challenges in the past as to this privity requirement” and their speculation that “our court may ... simply find[] that the relationship between the protected person and the conservator’s attorney [is] close enough to allow suit” did not render ALPS’s subsequent argument based on the Trask test unreasonable under § 33-18-242(5), MCA.
¶58 We therefore affirm the District Court’s conclusion that ALPS had a reasonable basis in law for contesting Redies’ claims against Addy. We now turn to the question of whether, given this outcome, any genuine issues of material fact remain.
V. Factual Issues
¶59 Redies asserts that a number of factual issues precluded granting summary judgment in this case. First, as described earlier, the District Court reasoned that “an adversarial situation” existed between Redies and Uerling and, thus, that Addy did not owe Redies a fiduciary duty dining the months immediately following her accident. Redies maintains that whether any of the relationships relevant to the issues herein were “adversarial” presents a factual issue. Second, the District Court also reasoned that Redies’ interests “should have been protected by her own attorney,” which presumably is a reference to Dunaway. Redies asserts that whether Dunaway acted as her attorney during that time period (aside from Dunaway’s brief role as attorney ad litem) and whether Cosner relied on Dunaway for advice in managing the conservatorship were issues of fact precluding summary judgment. Finally, Redies argues that whether Addy acted only as the attorney for Cosner, as conservator, or whether, by his statements and actions, he created an attorney-client relationship with Redies and her estate presents a factual issue. However, given our conclusion that ALPS had a reasonable basis in law for contesting Redies’ claims against Addy, resolution of these factual issues is unnecessary.
¶60 With respect to Redies’ “pretext” claim, she points out that the authors of the December 4, 2001 evaluation commissioned by ALPS stated that they “do not put a great deal of stock in this privity defense.” Thus, she argues, there is a factual dispute over “whether ALPS actually relied upon the ‘no privity’ defense, or whether that defense was asserted primarily to delay and increase the expense in prosecuting Ms. Redies’ legitimate claim.” Redies raised this issue in the District Court in response to ALPS’s summary judgment motion; however, the court did not rule on it explicitly. Nevertheless, we observe that one of the theories advanced by ALPS in the underlying suit (on Addy’s behalf) came straight out of Rhode, and, as explained *254 above, it was reasonable for ALPS to apply this precedent (and the Trask multi-factor balancing test recited in Rhode) to the factual scenario at hand. Thus, we conclude that Redies’ “pretext” claim lacks merit.
¶61 Redies also argues that, irrespective of our decision with respect to her § 33-18-201(6) claim, a trial is still necessary on her § 33-18-201(4) claim. She points out that in Shilhanek v. D-2 Trucking, Inc., 2003 MT 122, 315 Mont. 519, 70 P.3d 721, we held that the insurer had a reasonable basis in law for asserting that it was entitled to condition its payment of policy limits on the plaintiffs’ providing it with a release of all claims against its insureds, Shilhanek, ¶ 30, but that a factual issue remained as to whether the insurer had refused to make advance payments to the plaintiffs to cover their medical expenses without first conducting a reasonable investigation, Shilhanek, ¶¶ 34, 36-37. Thus, she maintains, even if ALPS had a reasonable basis in law for contesting her claims against Addy, a factual issue remains as to whether ALPS refused to pay her claims “without conducting a reasonable investigation,” § 33-18-201(4), MCA.
¶62 Redies misapprehends our disposition of the subsection (4) and subsection (6) claims in Shilhanek. As ALPS points out, the question of whether the insurer had violated its duty to make advance payments of medical expenses-a duty the insurer did not dispute it had — was separate from the question of whether it had a reasonable basis in law for refusing to pay policy limits without a release. Compare Shilhanek, ¶¶ 24-31, with Shilhanek, ¶¶ 34-37. In the case at hand, by contrast, the alleged subsection (6) violation (that ALPS “neglect[ed] to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability ha[d] become reasonably clear”) and the alleged subsection (4) violation (that ALPS “refuse[d] to pay claims without conducting a reasonable investigation based upon all available information”) are intertwined. At the time ALPS denied Redies’ claims, the record discloses that it had investigated the facts and obtained an evaluation of its options under the law applicable to those facts. This research, ultimately, formed the basis for Addy’s defense in the underlying action-namely, that under Rhode and the Trask test he did not owe a duty to Redies. Thus, the question of whether ALPS conducted a reasonable investigation before refusing to pay Redies’ claims is resolved by ALPS’s “reasonable basis in law” defense under § 33-18-242(5), MCA.
CONCLUSION
¶63 The District Court correctly concluded that ALPS had a *255 reasonable basis in law for contesting Redies’ claims against Addy and that there were no genuine issues as to any material facts. Accordingly, we affirm the District Court’s conclusion that ALPS was entitled to a judgment as a matter of law.[6]
CHIEF JUSTICE GRAY, JUSTICES WARNER and MORRIS concur.

 All of the proceedings discussed herein took place in the District Court for the Thirteenth Judicial District, Yellowstone County.

 These and other significant decisions reached by Addy, Cosner, Uerling, and Dunaway at the September 6, 1995 meeting were memorialized in a letter written by Addy to Cosner on September 7, 1995.

 Section 72-5-427(3)(w), MCA, provides as follows: “A conservator, acting reasonably in efforts to accomplish the purpose for which he was appointed, may act without court authorization or confirmation to... employ persons, including attorneys, auditors, investment advisors, or agents, even though they are associated with the conservator, to advise or assist him in the performance of his administrative duties; act upon their recommendation without independent investigation; and instead of acting personally, employ one or more agents to perform any act of administration, whether or not discretionary. . ..” (Paragraph break omitted.)

 As discussed earlier, Judge Baugh reached the opposite conclusion in the underlying action (Redies v. Addy), determining that “it is appropriate for the Court to apply the Trask factors to the present case.” Likewise, Judge Baugh determined in the underlying action that “when Mr. Addy rendered legal advice to Mr. Cosner, there was no conflict of interest between Mr. Addy, Mr. Cosner, and Ms. Redies.” The contrary *242 rulings by Judge Baugh and Judge Todd implicate the doctrine of res judicata; however, though Redies mentions “issue preclusion” in her opening brief, she does not develop the issue. Thus, we do not address it further. See In re Marriage of McMahon, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6 (“[W]e will not consider unsupported issues or arguments.”); M. R. App. P. 23(a)(4).

 “Privity of contract” refers to “[t]he relationship between the parties to a contract, allowing them to sue each other but preventing a third party from doing so.” Black’s Law Dictionary 1217 (Bryan A. Garner ed., 7th ed., West 1999).

 Given this conclusion, we deem Redies’ claim that the District Court abused its discretion by deciding ALPS’s motion for summary judgment without ruling on her motion under M. R. Civ. P. 56(f) and without affording her “a fair opportunity to complete discovery” moot.